NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0159n.06

No. 12-3360

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Feb 13, 2013

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| BRYAN CHRISTOPHER STURM, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| SUPERINTENDENT OF INDIAN RIVER | ) | COURT FOR THE |
| JUVENILE CORRECTIONAL FACILITY, | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Respondent-Appellee. | ) | |

**O P I N I O N**

BEFORE: CLAY, GILMAN and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Petitioner Bryan Christopher Sturm, adjudicated delinquent

in Ohio on two counts of murder, filed a petition for writ of habeas corpus. The district court denied

the petition, but certified two issues for appeal. The issues presented on appeal in this tragic case

are whether the Ohio courts unreasonably applied clearly established federal law in denying Sturm's

claims (1) that his Fifth Amendment protection against self-incrimination was violated by the trial

court's admission of his confession; and (2) that he was denied his Sixth Amendment right to

effective assistance of counsel. For the reasons that follow, we find no error in the district court's

analysis of the two claims and therefore affirm the denial of habeas relief.

## I. BACKGROUND[1]

The deceased bodies of twelve-year-old Bryan Sturm's grandmother and aunt, Nancy Tidd and Emma Tidd, respectively, were found sitting in the living room of the grandmother's home in the evening hours of November 22, 2004. Each woman had suffered a fatal gunshot wound to the head. Within hours, the investigation focused on Sturm at his home in nearby Lower Salem. Detective Mike Warden of the Washington County Sheriff's Department, who was acquainted with Sturm's father, began questioning Sturm at about 11:50 p.m., with the father's permission and in his presence. The questioning took place in an unmarked police cruiser parked outside the Sturm residence. Warden advised Sturm that he was not under arrest, did not have to speak with the police, and could leave at any time. Sturm said he understood.

In response to questioning, Sturm acknowledged that he had not gone to school that day. He had slept in until about 1:00 p.m. and then "huffed" gasoline. Sturm said his stepbrother gave him a ride to his grandmother's house. There he received permission to use a .410 shotgun for target practice in the backyard. After getting in an argument with his grandmother, Sturm said he called his uncle for a ride home. Detective Warden had reason to believe Sturm had actually received a ride home from a motorist who reported having pickedup a shirtless boy walking along State Route 530 early that evening. The motorist had dropped his rider off in Lower Salem. Believing that Sturm

---

[1]As to the fact summary that follows, drawn largely from the opinion of the Ohio Court of Appeals, there is no dispute. *In the Matter of Bryan Christopher Sturm*, No. 05CA35, 2006 WL 3861074 at *2-5 (Ohio Ct. App. Dec. 22, 2006).

was lying about how he got home, Warden asked Sturm's father for permission to continue the questioning outside his presence. Sturm's father stepped out of the vehicle and granted permission.

Warden confronted Sturm about his apparent untruthfulness. Following a few more questions, Sturm confessed to having shot his aunt and his grandmother. He explained that his grandmother started "putting him down." When he raised the shotgun, his aunt intervened and grabbed the gun. The shotgun accidentally fired, striking his aunt in the side of the head. Sturm said he then reloaded and shot and killed his grandmother. He left the shotgun there in the laundry room and started walking through the woods behind the house, eventually getting a ride home.

At this point in the interview, about 12:19 a.m., Warden read Sturm his *Miranda* rights and, after obtaining a written waiver, tape-recorded Sturm's statement. Sturm was arrested, taken into custody and detained in the Washington County Juvenile Center, charged with being delinquent based on two counts of aggravated murder.

Prior to trial, Sturm moved to suppress the statement he gave to Detective Warden, contending that it was elicited during custodial interrogation before he had been advised of his *Miranda* rights. The Washington County Juvenile Court concluded that Sturm was not in custody when he gave the confession and denied the motion. In February 2005, Sturm was tried by a jury in the juvenile court and was found delinquent on two counts of murder. A blended sentence was imposed. Sturm was committed to the Ohio Department of Youth Services until he reaches the age of twenty-one. Thereafter, he is subject to two consecutive prison terms of fifteen years to life, a sentence which is stayed, however, pending successful completion of the juvenile disposition. The adjudication was affirmed on direct appeal. *Sturm*, 2006 WL 3861074. Sturm's motion for post-

conviction relief was denied by the juvenile court without a hearing on November 15, 2007. This ruling, too, was affirmed. *In the Matter of B.C.S.*, No. 07CA60, 2008 WL 4823572 (Ohio Ct. App. Oct. 29, 2008). After the Ohio Supreme Court denied leave to appeal, Sturm filed his petition for habeas relief in the United States District Court for the Southern District of Ohio. The petition was denied on February 24, 2012, but the district court certified two issues for appeal.

Sturm contends the district court erred in denying his claims that the Ohio Court of Appeals unreasonably applied clearly established federal law in holding first, that he was not in custody when he gave his confession, and second, that he had not been denied effective representation. As to the former issue, Sturm contends that both courts failed to properly consider his age in determining whether a reasonable person in his position would have felt free to terminate the conversation with Detective Warden and exit the police cruiser. As to the latter issue, Sturm insists that his trial counsel's failure to obtain and call expert witnesses in support of his defense cannot be considered sound trial strategy, was substandard representation, and resulted in prejudice. Sturm contends counsel should have consulted and obtained experts to testify regarding coerced/false confessions, firearm ballistics, crime scene reconstruction, and DNA evidence.

## II. ANALYSIS

### A. Standard of Review

We review the district court's legal conclusions and rulings on mixed questions of law and fact de novo, and review factual findings for clear error. *Jalowiec v. Bradshaw*, 657 F.3d 293, 301 (6th Cir. 2011). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the federal courts may not grant habeas relief on any claim that was adjudicated on the merits in the state courts

unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

Under the "unreasonable application" clause, a federal court may grant the writ only if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the petitioner's case. *Id.* "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, to warrant habeas relief, the application must be found to be "objectively unreasonable." *Id.* at 409. Petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). This standard is designed to be difficult to meet because habeas relief is reserved for "extreme malfunctions" in the state criminal justice system. *Harrington*, 131 S. Ct. at 786.

In analyzing whether a state court decision is contrary to or an unreasonable application of "clearly established" Supreme Court precedent, we look to the holdings of the Supreme Court's decisions as of the time that the state court rendered its decision. *Greene v. Fisher*, 132 S. Ct. 38, 44–45 (2012).

## B. Custody

Petitioner Sturm correctly argues that if he was "in custody" when he first gave his confession to Detective Warden without having been *Mirandized*, then his confession should have been suppressed. The Ohio Court of Appeals, the last Ohio court to decide the merits of Sturm's claim in a reasoned opinion, held that he was not in custody when he first gave his incriminating statement to Warden and that the statement was properly admitted as evidence against him. The district court's denial of Sturm's habeas petition is based on its adoption of a Report and Recommendation by the magistrate judge. The district court concluded that the Ohio Court of Appeals' ruling was not contrary to or an unreasonable application of clearly established federal law.

The district court correctly identified the governing standards under clearly established federal law. In short, whether a person was in custody, triggering the need for advisement of *Miranda* rights, is an objective inquiry. Considering all the surrounding circumstances, the question is whether a reasonable person in the suspect's situation would have perceived that he was "deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 477 (1966). A person is deemed to have been in custody if he was either under arrest or his freedom of movement was restrained to a degree associated with formal arrest. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). This objective determination does not depend on the subjective perceptions of either the

person being questioned or the interrogating officer. *Stansbury v. California*, 511 U.S. 318, 323

(1994). The actual mindset of the particular suspect plays no role in the assessment. *Yarborough*

*v. Alvarado*, 541 U.S. 652, 667 (2004). Rather, the inquiry is whether a reasonable person in the

suspect's position would have felt free to leave. *Id.* at 663.

Applying these standards, the district court summarized the undisputed factual findings that

formed the basis for the Ohio Court of Appeals' ruling. The court noted in particular that Sturm

voluntarily agreed to speak with Detective Warden in the unmarked vehicle with his father's

permission and in his father's presence; that Warden expressly advised Sturm that he did not have

to speak with the police and was free to get out of the car and walk away at any time; that Sturm said

he understood; and that the interview lasted only about thirty minutes before Warden advised Sturm

of his *Miranda* rights and recorded his statement. The district court summed up its ruling as follows:

> Based on these facts, the Magistrate Judge is unable to conclude that the state
> appellate court's decision rejecting Petitioner's claim contravened or unreasonably
> applied federal law, or constituted an unreasonable determination of the facts in view
> of the evidence presented. As noted by the state appellate court, the record fails to
> reflect use of coercive or threatening police techniques or an atmosphere such as
> would cause a reasonable person to understand he was not free to leave. Petitioner
> voluntarily dressed and accompanied police to the unmarked car with his father to
> speak with them. The period of time during which Petitioner was questioned by
> police was relatively brief. While two police officers accompanied Detective
> Warden, one of those was physically removed from and uninvolved with Petitioner's
> interview, and the other left the vehicle for a brief period during the time that
> Petitioner confessed. Moreover, police requested permission of Petitioner's father,
> who was present during the initial portion of police questioning, and available
> outside of the car during the time that Petitioner confessed and later provided a taped
> statement. The record provides no indication that Petitioner did not understand that
> he was free to leave and could go at any time without speaking to police.

R. 14, Report and Recommendation at 21-22, Page ID ## 3290-91. The district court thus found no error in the Ohio Court of Appeals' ruling that Sturm was not in custody.

Sturm insists the Ohio Court of Appeals' ruling is clearly unreasonable because it fails to adequately consider his young age in assessing whether a reasonable person in his situation would have felt free to leave the police vehicle. Citing *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011), he contends that a suspect's age is a factor within the totality of circumstances that must be considered in making the custody determination. Indeed, the holding of *J.D.B.* is succinctly stated:

> It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave. Seeing no reason for police officers or courts to blind themselves to that commonsense reality, we hold that a child's age properly informs the *Miranda* custody analysis.

*Id.* at 2398-99. Sturm acknowledges that *J.D.B.* was decided after the Ohio Court of Appeals' ruling in 2006, but contends that it reflects the law which had already become clearly established at the time of the court's ruling.

The objective reasonableness of the Ohio Court of Appeals' decision is measured against the Supreme Court's precedents as of the time the court rendered its decision. *Greene*, 132 S. Ct. at 44. We reject the notion that *J.D.B.* reflects the clearly established law at the time of the Ohio Court of Appeals' ruling. Both the majority and dissenting opinions in *J.D.B.* demonstrate that prior Supreme Court decisional law provided that failure to consider a minor suspect's age as part of the *Miranda* custody analysis was not contrary to or an unreasonable application of clearly established law. *See J.D.B.*, 131 S. Ct. at 2405, 2412, 2417. Specifically, in *Alvarado*, in 2004, the Court reversed the Ninth Circuit's grant of habeas relief, concluding the state court's failure to consider age was not

objectively unreasonable. The *Alvarado* Court observed that "[o]ur opinions applying the *Miranda* custody test have not mentioned the suspect's age, mush less mandated its consideration." 541 U.S. at 666.

*Alvarado* represented the state of the law at the time of the Ohio Court of Appeals' ruling. It follows that failure to explicitly consider Sturm's age would not have rendered the Ohio Court of Appeals' custody analysis objectively unreasonable. Yet, in any event, the Ohio Court of Appeals clearly did *not* fail to consider Sturm's age. The court correctly recognized that the custody determination was an objective inquiry. *Sturm*, 2006 WL 3861074, at *8. It recognized its responsibility to evaluate the totality of the circumstances. *Id.* Further, referring to Ohio law, the court defined the totality of the circumstances as including, among other things, the *age* of the suspect. *Id.* After recounting the salient facts, the court explained its analysis in detail, demonstrating that it did not just pay lip service to this standard, but actually and meaningfully considered Sturm's youth. "Although Sturm was young," and "despite his young age," the court held the record clearly supported the finding that he was not in custody. *Id.* Twice the court stated its conclusion: "When viewing the totality of the circumstances, a reasonable *juvenile* in Sturm's position would not have believed that he or she was in custody at the time of the interview." *Id.* (emphasis added).

Thus, although the teaching of *J.D.B.* was not available to the Ohio Court of Appeals, and although the clearly established federal law did not *require* the court to consider Sturm's age in making its custody determination, the Ohio Court of Appeals clearly did so. We therefore find no merit in Sturm's argument that the Ohio Court of Appeals' decision is flawed for lack of

consideration of his age. Nor has Sturm demonstrated that the Ohio Court of Appeals' custody assessment was otherwise contrary to or an unreasonable application of clearly established federal law.

Sturm argues that the court failed to adequately consider the impact of Warden's "coercive" interrogation techniques on a twelve-year-old's perception of his freedom to leave. Sturm has not identified record support for a finding that he was subject to coercion. Yes, the length and manner of questioning are factors bearing on the custody determination. *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). The Ohio Court of Appeals considered these factors. It noted that the interviews "were of relatively short duration," and that there was no evidence that the interviews were "harsh or intense," no evidence that Sturm suffered from any "physical deprivation or mistreatment," and no evidence that he was "threatened or induced to confess." *Sturm*, 2006 WL 3861074, at *8. Warden did tell Sturm he was lying about how he got home from his grandmother's house and asked Sturm whether it was possible that the shotgun went off accidentally, striking his aunt and grandmother. These expressions of Warden's views *could* have influenced how a reasonable juvenile in Sturm's position might have perceived his freedom to leave. *See Stansbury*, 511 U.S. at 326. However, Warden's confronting of Sturm on the untruthfulness of his story about how he got home was quite mild, hardly coercive. And the "minimization" suggestion of a possible accidental shooting was not so threatening or misleading as to have affected a reasonable juvenile's belief that he was still free to leave, as he had been expressly assured with his father standing by. Accordingly, we cannot find that the Ohio Court of Appeals' assessment of these factors was objectively unreasonable.

Sturm correctly points out that the Ohio Court of Appeals' analysis included mention of considerations beyond the scope of the proper objective inquiry. The court took note of record evidence indicating that Sturm had a "high IQ" and had "prior experience with police questioning." *Sturm*, 2006 WL 3861074, at *8. The court viewed this evidence as indicating that, despite his young age, "Sturm possessed a high enough level of intelligence and maturity to understand the officers." *Id.* Sturm's prior experience with the police was deemed to bolster that conclusion. *Id.* The court's mention of these considerations was consistent with the Ohio law requirement that the suspect's "mentality and prior criminal experience" be considered as part of the totality of the circumstances. *Id.* Such considerations are "improper," however, under federal law. *Alvarado*, 541 U.S. at 666–69 (observing that such "contingent psychological factors" implicate the suspect's subjective state of mind, something beyond the knowledge of the interrogating officer charged with responsibility for deciding when *Miranda* warnings should be given).

Yet, despite the Ohio Court of Appeals' mention of these subjective considerations, its holding on the custody issue, iterated twice, is clearly stated as an objective determination. The reference to subjective considerations was ostensibly designed to satisfy the requirements of state law and buttress the conclusion that Sturm was not manifestly handicapped or otherwise not within the class of "reasonable juveniles." Any apparent inconsistency in the court's analysis is insignificant, falling far short of the "extreme malfunction" needed to warrant habeas relief under deferential AEDPA review. *Harrington*, 131 S. Ct. at 786. We thus find no cognizable error in the

Ohio Court of Appeals' holding that Sturm's Fifth Amendment protection against self-incrimination was not violated and that his confession was properly admitted into evidence.[2]

## C. Ineffective Assistance of Counsel

In the second claim certified for appeal, Sturm contends the representation he received from trial counsel was constitutionally deficient, in violation of his Sixth Amendment right to effective assistance of counsel. Sturm contends there was no reasonable strategic reason for counsel's failure to seek appointment of experts to rebut the prosecution's case—experts on false confessions, firearm ballistics, DNA evidence, and crime scene reconstruction. The Ohio Court of Appeals affirmed the juvenile court's denial of this claim in a carefully reasoned opinion. *B.C.S.*, 2008 WL 4823572. In denying habeas relief, the district court quoted the appellate court's opinion in great length, agreeing with its conclusion that Sturm had failed to show that he was prejudiced by any deficiencies in his counsel's performance.

In determining that the Ohio Court of Appeals' denial of Sturm's ineffective assistance of counsel claim was not an unreasonable application of clearly established federal law, the district court correctly summarized the governing standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim, a petitioner must show both that counsel's performance

---

[2]Finding no cognizable error in the Ohio Court of Appeals' determination that Sturm was not in custody when he first confessed to Warden, we need not address Sturm's contention that the subsequent *Miranda* warnings were ineffective to cure the earlier failure to *Mirandize*, per *Missouri v. Seibert*, 542 U.S. 600 (2004). Because Sturm was not in custody when he first confessed, there was nothing improper in Warden's earlier failure to *Mirandize* that needed to be "cured." *Seibert* applies only to a statement given during prewarning *custodial* interrogation. *See id.* at 604–05; *United States v. Johnson*, 680 F.3d 966, 979 (7th Cir. 2012).

was "deficient," i.e., "fell below an objective standard of reasonableness;" and that the deficiency resulted in "prejudice," i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. Both prongs of the test must be met to justify relief. Hence, a reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Id.* at 697. If a claim must be denied for lack of a showing of sufficient prejudice, then the court need not also "grade counsel's performance" by scrutinizing its adequacy. *Id.*

Sturm had presented his ineffective assistance of counsel claim to the juvenile court in a post-conviction motion, supported, *inter alia*, by affidavit of his trial counsel, Raymond H. Smith. Smith's affidavit indicates that budget limitations in the Washington County Branch of the Ohio Public Defender's Commission played a role in his failure to obtain confessions, ballistics, and crime scene reconstruction experts. The juvenile court denied the motion, finding counsel's performance neither deficient nor prejudicial. *See B.C.S.*, 2008 WL 4823572, at \*8. The juvenile court dismissed Attorney Smith's insufficient-funds explanation as a disingenuous post-hoc rationalization of a competent, experienced attorney still zealously advocating for his client. *Id.* The juvenile court observed that counsel could have had unlimited resources at his disposal in this double-homicide prosecution of a twelve-year-old. Recalling that counsel had pushed the State to a quick trial, the court concluded that the decision to forego the use of experts was a purposeful part of his trial strategy. *Id.*

The Ohio Court of Appeals faulted the juvenile court for rejecting defense counsel's affidavit, calling it an unwarranted failure to give due deference. Yet, upon accepting the averments of counsel's affidavit to be true, the Ohio Court of Appeals nonetheless held the juvenile court's error was harmless. With thoroughness and clarity, the Ohio Court of Appeals explained that, despite any deficiency in counsel's performance, the failure to obtain experts did not prejudice the defense. *Id.* at *13–15. This conclusion was driven by recognition that Sturm's confession, properly admitted in evidence and not shown to be coerced or false or unreliable, "was powerful and damaging evidence against Sturm." *Id.* at *15. The court acknowledged that there were inconsistencies between Sturm's story and the physical evidence, or lack thereof, at the scene, and recognized that Sturm's confession "did not 'exactly mirror' the evidence." *Id.* The court noted, however, that defense counsel brought many of these inconsistencies to the jury's attention through cross-examination of prosecution witnesses and in closing argument. Further, the court emphasized that Sturm confessed to shooting his aunt and grandmother; that his confession placed him in the grandmother's home at the time of the murders; that the confession included details only the shooter could have known; that Sturm admitted taking steps to destroy forensic evidence; and that his behavior immediately following the shooting was consistent with guilt. *Id.* The court also noted that Sturm had not recanted his confession and had essentially affirmed it during a psychological evaluation as recently as two weeks prior to trial. *Id.* at *13.

We find nothing unreasonable in the Ohio Court of Appeals' application of the *Strickland* standard in concluding that Sturm has not shown prejudice. To the contrary, its analysis is in all

respects thorough and judicious. Like the Ohio Court of Appeals, we are troubled by the possibility

that the defense strategy was handicapped by unreasonably tight financial constraints. A more

thorough investigation by defense experts addressing inconsistencies between Sturm's confession

and the physical evidence at the scene would seem to have been advisable. Yet, given Sturm's

confession, which has not been shown to be unreliable and which Sturm has never formally recanted,

there is no basis for concluding that the defense was prejudiced by any shortcomings in defense

counsel's performance.

Sturm insists that the outcome of the trial could have been different if his trial counsel had

utilized experts who would have created questions about the integrity of the prosecution's case by

highlighting the lack of ballistics evidence, the lack of DNA evidence, the failure of the police to

preserve evidence at the crime scene, and the psychological dynamics that could have contributed

to a false confession. In the face of Sturm's confession, however, and other evidence corroborating

it, Sturm's present argument amounts only to speculation, not a "reasonable probability" of a

different outcome. *See Harrington*, 131 S. Ct. at 791–92 (to establish *Strickland* prejudice,

likelihood of a different result must be shown to be substantial, not just conceivable); *Sowell v.

Anderson*, 663 F.3d 783, 399–800 (6th Cir. 2011) (despite deficiencies in defense counsel's

investigation, no prejudice was shown where petitioner failed to show how a more thorough

investigation would have produced evidence undermining confidence in the verdict); *Baze v. Parker*,

371 F.3d 310, 322 (6th Cir. 2004) (speculation is insufficient to make out a successful claim of

prejudice).

Further, as *Strickland* makes clear, the prejudice focus is not merely on outcome determination. Cognizable prejudice consists of a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id*.

We acknowledge that Sturm's confession—even though voluntarily given, properly admitted in evidence, and not expressly repudiated—is not necessarily conclusive of his guilt. *See Crane v. Kentucky*, 476 U.S. 683, 688–89 (1986). If the confession were shown to be insufficiently corroborated or otherwise unworthy of belief, the jury would have been at liberty to disregard it. *Id*. Sturm has failed to demonstrate, however, that the substance of his confession was so lacking in corroboration as to render it unworthy of belief. We concur in the Ohio Court of Appeals' assessment that any questions the defense might have better raised through expert testimony fall short of establishing a reasonable probability that the outcome of the trial would have been different. In the face of Sturm's confession that he shot his aunt and his grandmother—a confession not recanted and not shown to be false or unreliable—we cannot find that counsel's failure to better utilize experts to challenge the prosecution's proofs rendered the trial fundamentally unfair or

undermines confidence in the jury's verdict.  We therefore reject Sturm's second claim of error as well.

### III.  CONCLUSION

Applying the highly deferential standard of review prescribed by AEDPA, we concur in the district court's determination that the Ohio courts' decisions on the two claims certified for review were neither contrary to nor an unreasonable application of clearly established federal law.  The district court's judgment denying the writ of habeas corpus is therefore **AFFIRMED**.