# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 15, 2024      Decided December 27, 2024

No. 23-3166

UNITED STATES OF AMERICA,
APPELLEE

v.

DARRELL NEELY,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00642-1)

---

*Paul F. Enzinna*, appointed by the court, argued the cause and filed the briefs for appellant.

*T. Dietrich Hill*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Matthew M. Graves*, U.S. Attorney, and *Chrisellen R. Kolb*, *John P. Mannarino*, *Michael L. Barclay*, and *Kyle R. Mirabelli*, Assistant U.S. Attorneys.

Before: WILKINS and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  On January 6, 2021, following a rally held by former-President Trump, a number of individuals entered the U.S. Capitol building and grounds, disrupting the joint session of Congress held to certify the 2020 presidential election.  Darrell Neely was one of those individuals.  He spent over an hour in the Capitol building, during which time he stole U.S. Capitol Police property.  After a bench trial, Neely was convicted of five misdemeanor offenses and sentenced to 28 months in prison.  On appeal, he challenges the denial of three pretrial motions on statutory and constitutional grounds.  After considering each of Neely's arguments, we conclude that none prevail and affirm his convictions and sentence.

**I.**

Darrell Neely, radio host of the streaming show "Global Enlightenment Radio Network," was part of a crowd of people who stormed the Capitol on January 6, 2021.  At the time that Neely entered the Capitol grounds, law enforcement had established a line barring further entry and signs displayed that the area was closed.  Neely spent at least 20 minutes on the Lower West Terrace of the Capitol grounds, then entered the building itself, where he remained for over an hour.  While in the building, Neely took various items that belonged to the Government, including a U.S. Capitol Police patch, badge, name tag, and baseball hat.  Neely later wore the baseball hat while broadcasting his radio show.

Based on this and other conduct, Neely was indicted on October 12, 2022, in a Superseding Indictment.  He moved to dismiss the counts under 18 U.S.C. § 1752(a), arguing that the statute did not cover his conduct because the U.S. Capitol building and grounds were not "restricted" by the Secret

Service. The same day, Neely moved to transfer venue based on his concerns that he could not be tried by an impartial jury in the District of Columbia. He also moved to suppress a confession he gave to law enforcement. The District Court denied all three motions. Neely waived his right to a jury trial and proceeded to bench trial on all counts. That trial commenced on May 22, 2023, and concluded on May 25, 2023. On May 25, 2023, Neely was convicted of violations of 18 U.S.C. §§ 641, 1752(a)(1) & (2), and 40 U.S.C. § 5104(e)(2)(D) & (G) and acquitted of one count of 18 U.S.C. § 231(a). He was sentenced to a term of 28 months.

On appeal, Neely argues that the District Court erred in denying his pretrial motions. Because the District Court correctly decided each of the three issues, we affirm Neely's convictions and sentence in full.

## II.

Neely filed three relevant pretrial motions: (1) a motion to dismiss two counts of 18 U.S.C. § 1752(a) as improperly charged, and alternatively, unconstitutionally vague; (2) a motion to suppress certain statements he gave to police after he signed a *Miranda* waiver; and (3) a motion to transfer venue based on jury prejudice. We address each in turn.

## A.

The motion to dismiss below was predicated on Neely's interpretation of 18 U.S.C. § 1752(a). "We review preserved claims of statutory interpretation . . . *de novo*," *United States v. Saffarinia*, 101 F.4th 933, 939 (D.C. Cir. 2024), including claims that a statute "is unconstitutionally vague," which present a "pure question[] of law," *United States v. Bronstein*,

849 F.3d 1101, 1106 (D.C. Cir. 2017) (internal quotation marks omitted).

**1.**

Neely first contends that the statutory prohibition against "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so," under 18 U.S.C. § 1752(a), is limited to buildings or grounds that have been restricted by the U.S. Secret Service. Because the Capitol building and grounds were restricted by the U.S. Capitol Police on January 6, 2021, Neely argues that his conduct there is not actionable under Section 1752(a). The District Court, per Neely, thus erred in denying his motion to dismiss those charges. The Government counters that the Court should read the statute as it is: silent as to *who* restricts the pertinent area. The plain text of the statute trumps Neely's arguments to the contrary.

18 U.S.C. § 1752(a)(1) criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." Subsection (a)(2) defines the offense of "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds," where the act "impedes or disrupts the orderly conduct of Government business or official functions." Subsection (c)(1) defines the term "restricted buildings or grounds" as follows:

> [A]ny posted, cordoned off, or otherwise restricted area—(A) of the White House or its grounds, or the Vice President's official residence or its grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds

so restricted in conjunction with an event designated
as a special event of national significance[.]

By its terms, Subsection (a) does not specify that the "restricted building and grounds" shall be so restricted only by the Secret Service. The District Court ruled that this was dispositive, reasoning that "[t]o understand why Neely's argument has failed to persuade a single court, one need only read the plain text of § 1752(c)." *United States v. Neely*, No. 21-cr-642, 2023 WL 1778198, at *3 (D.D.C. Feb. 6, 2023) (Bates, J.). We agree.

As Neely conceded at oral argument, the statutory text is silent as to who may restrict the relevant areas under Section 1752(a). Because the Court does not "read into statutes words that aren't there," *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020), we decline to supplement Section 1752(a) with a requirement that "any restricted building or grounds" be so designated only by the Secret Service. *Accord Johnston v. SEC*, 49 F.4th 569, 577 (D.C. Cir. 2022) ("Because the SEC's interpretation does not require reading any additional words into the statute, whereas Johnston's would, we adopt the SEC's interpretation.").

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005), is not to the contrary. There, local and federal law enforcement coordinated to provide security for the restricted area. Because the Fourth Circuit concluded that "there was ample evidence that Bursey understood the area to have been restricted by the Secret Service, and thus a federally restricted zone," *id.* at 309, per Neely, the focus on the Secret Service shows that restriction by that entity is a statutory requirement. The Government counters that the *Bursey* court's analysis was limited to the statute's *mens rea* requirement and the court "does not hold, or even imply, that § 1752 requires that only the Secret Service

may restrict the relevant area." Appellee Br. 35. But there is a more fundamental issue with Neely's reliance on *Bursey*: That case interpreted a prior version of the statute, which defined "restricted area[s]" as those restricted by Secret Service regulations. *Id.* at 306–07. Even if *Bursey* conclusively held that the Secret Service must restrict buildings or grounds, such a holding was based on a statute which is no longer in effect. *Bursey* does not control the question before this Court.

Neely argues that a plain text reading "ignores the fact that in enacting the statute and in each of its amendments, Congress has clearly understood—and intended—the statute to apply to the Secret Service." Appellant Br. 7. He urges that the legislative history reveals that Congress intended the statute to define conduct "within the purview of the Secret Service," *id.* at 11, citing statements made by two House representatives and noting that "[t]he legislative history is devoid of any mention of any other agency," *id.* at 11–12. But even assuming that Neely has correctly interpreted the legislative history, it cannot be used to inject new meaning into unambiguous statutory text. *See United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021). "The intentions of committees of either house regarding a certain subject, where these intentions conflict with the express provisions of existing law, cannot simply be read into a statute that is otherwise silent on the subject." *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981).

The same is true as to Neely's appeal to the regulatory history. Although he accurately notes that the Secret Service used to possess regulatory authority to define specific restricted areas under Subsection 1752(a), as the Government points out, Congress subsequently amended the statute to eliminate any references to the former regulatory regime. *See* USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 602, 120 Stat. 192, 252 (2006); Federal

Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012). As such, the prior regulations were rescinded by the agency, which clarified that following amendment, since "the statute in its current form makes no reference to regulation," "the offense conduct is fully described in the text of the statute itself." Restricted Buildings and Grounds, 83 Fed. Reg. 18939, 18940 (May 1, 2018). While Neely concedes that the statute no longer contains the language upon which he relies, he nevertheless claims that because Congress has not expressly divested the Secret Service of that authority or assigned it to another agency, the Secret Service remains authorized to restrict grounds under Subsection 1752(a). The parties agree that the Secret Service can restrict grounds. The Government merely disputes that the Secret Service is the *exclusive* restricting authority. Neely's invocation of the regulatory history simply confirms that Congress intended to empower the Secret Service to restrict grounds within the meaning of Section 1752 but does not show that it sought to do so at the expense of other law enforcement agencies.

Last, Neely's proposed scenarios do not persuade us that a plain text reading of Subsection 1752(a) would yield absurd results. "A statutory outcome is absurd if it defies rationality by rendering a statute nonsensical or superfluous or if it creates an outcome so contrary to perceived social values that Congress could not have intended it." *United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010) (cleaned up). To establish absurdity is "a high threshold." *Id.* Neely argues that under the Court's reading of the statute, any individual—whether they are an employee of the Kennedy Center or a private security officer at a deli—could establish restricted grounds under Subsection 1752(a). But under these hypotheticals, the *mens rea* requirement would ensure that any individual convicted of such an offense would have knowingly entered

into a restricted zone. As the Government presses, federal law enforcement frequently coordinates with state and local counterparts, or even private security, to secure areas. Neely does not explain why such outcomes are "nonsensical" or "so contrary to perceived social values" that they could not have been intended.

Neely also argues that absent a limitation on who can restrict relevant areas, private citizens could freewheelingly create criminal liability for unsuspecting individuals. But the statute does not sanction otherwise unauthorized individuals to exercise such power: Neely points to no statutory provision purporting to expand the class of individuals with restricting authority and offers no response to the Government's citation to parallel provisions as examples of such enabling language. *See* 18 U.S.C. § 3056(a) ("[T]he United States Secret Service is authorized to protect [designees]."); 2 U.S.C. § 1961(a) (authorizing the Capitol police to "police the United States Capitol Buildings and Grounds"); *id.* § 1963 (same).

Section 1752(a) thus does not require that the Secret Service restrict "any restricted building or grounds."

**2.**

Neely also alternatively argues that, read as written, Subsection 1752(a) is unconstitutionally vague as applied to him. "The void-for-vagueness doctrine developed from the rule of construction that penal statutes are to be construed strictly in favor of the accused." *Bronstein*, 849 F.3d at 1106 (internal quotation marks and citation omitted). "[A] statute is unconstitutionally vague if, applying the rules for interpreting

legal texts, its meaning specifies no standard of conduct at all." *Id.* at 1107 (cleaned up).

> A law may be vague in violation of due process for failure to give notice to the public or guidance to law enforcement or both: "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."

*United States v. Nassif*, 97 F.4th 968, 981 (D.C. Cir. 2024) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).

Neely persists that nothing in the statute indicates that Subsection 1752(a) prohibits entry into areas restricted by the U.S. Capitol Police, but the plain text of the statute unambiguously includes such locations. The "restricted" signs on the Capitol grounds, coupled with the presence of federal law enforcement officers enforcing the boundaries, clearly sufficed to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Moreover, Neely states that he has been unable to locate a single case prosecuted under Section 1752 involving areas restricted by those other than the Secret Service, arguing that a potential defendant would not be on notice that conduct on grounds restricted by the U.S. Capitol Police could be charged under the statute. But "Supreme Court precedent teaches that the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague." *Kincaid v. District of Columbia*, 854 F.3d 721, 729 (D.C. Cir. 2017). This is because the Department of Justice's interpretation of a statute does not elucidate legislative intent at enactment.

"[C]riminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014); *see also United States v. Sorensen*, 801 F.3d 1217, 1228 (10th Cir. 2015) (relying "on the statute's plain language to affirm the conviction" because "[e]ven if the government had never prosecuted someone in [the defendant's] position," courts would still "look to the statute's plain language and conclude that [his] charge fits within" it).

*Bouie v. City of Columbia*, 378 U.S. 347 (1964), does not help Neely. There, two Black students entered a restaurant and, in response, an employee hung up a "No Trespassing" sign. *Id.* at 348. When asked to leave, the students refused, and were charged with trespassing under a state statute that forbade "entry upon the lands of another after notice prohibiting such entry." *Id.* at 348, 351–52 (cleaned up). The students were convicted and on appeal, the South Carolina Supreme Court affirmed, "constru[ing] the statute to cover not only the act of entry on the premises of another after receiving notice not to enter, but also the act of remaining on the premises of another after receiving notice to leave." *Id.* at 350. The Supreme Court invalidated the defendants' convictions because while the statutory text was not vague, the state supreme court's "unforeseeable and retroactive judicial expansion of narrow and precise statutory language" constituted "a deprivation of the right of fair warning." *Id.* at 352.

Neely cites *Bouie* to argue that the absence of judicial decisions affirming Subsection 1752(a) convictions occurring on grounds restricted by those other than the Secret Service deprived him of fair notice that such conduct was criminal. But in *Bouie*, the plain text of the statute was clear and "the uncertainty as to the statute's meaning [was] itself not revealed until the court's decision," *id.*, whereas here, Neely argues that the statutory text itself is void-for-vagueness. (And we have

rejected this argument.) Thus, *Bouie* does not support a conclusion that Section 1752(a) is unconstitutionally vague as applied.

Finally, because the statute is not ambiguous, the rule of lenity has no role to play in its interpretation. *See Beecham v. United States*, 511 U.S. 368, 374 (1994). Section 1752(a) is consistent with the Due Process Clause and the District Court correctly denied Neely's motion to dismiss because the statute is not unconstitutionally vague.[1]

**B.**

Neely also appeals the District Court's denial of his motion to suppress the videotaped statement that he gave to the Federal Bureau of Investigation ("FBI") on October 18, 2021, following his arrest. That motion argued that Neely's written waiver of his *Miranda* rights was neither voluntary nor intelligent as required by the Fifth Amendment. The challenged interview was Neely's third conversation with the FBI. The first two occurred before his arrest, in January and June 2021. Neely claims that because he was not provided with *Miranda* warnings during the first two interviews, the warning

---

[1] Neely argues in a footnote that Section 1752(a)(2), which proscribes conduct "within such proximity to" restricted areas, is unconstitutionally vague because it does not define the relevant location with specificity. But Neely does not have standing to bring such a claim. "[A]n individual 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *United States v. Nassif*, 97 F.4th 968, 981 (D.C. Cir. 2024) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010)). Neely was convicted of Section 1752(a) violations not just for remaining "within proximity to" the U.S. Capitol buildings and grounds, but for actually entering them. That conduct is clearly encompassed by the statute, depriving Neely of standing to challenge its other applications.

given prior to the third interview was constitutionally ineffective under *Missouri v. Seibert*, 542 U.S. 600 (2004). He asks us to hold that the District Court erred in denying his motion without a hearing.

While any factual findings made by the District Court are reviewed for clear error, "[t]he question whether a given set of facts meets the legal threshold needed to overcome [the] prophylactic protection of Fifth and Sixth Amendment rights is reviewed *de novo*." *United States v. Straker*, 800 F.3d 570, 621 (D.C. Cir. 2015) (per curiam). Although we have not yet "establish[ed] a standard of review with respect to the District Court's denial of [a] request for a" motion to suppress hearing, *United States v. Guertin*, 67 F.4th 445, 449 (D.C. Cir. 2023), the Government urges the Court to "review the denial of an evidentiary hearing on a motion to suppress for abuse of discretion," *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (internal quotation marks omitted). Neely does not offer a contrary standard, so we will assume without deciding that the District Court's denial of a hearing is reviewed for abuse of discretion.

## 1.

Neely contends that his two unmirandized pre-arrest interviews invalidated his later *Miranda* waiver because at that point, after being questioned without a Miranda warning twice, he did not "think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Seibert*, 542 U.S. at 613. The Government defends the ruling below that the October 18th waiver was voluntary under *Seibert*.[2] Because the *Seibert*

---

[2] For the first time on appeal, the Government urges the Court to decide that the lawfulness of the pre-arrest interviews is fatal to Neely's *Seibert* claim. The Circuits are unanimous that *Seibert*

framework demonstrates that the contested statements were not elicited unconstitutionally, we affirm.

**a.**

"A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon v. Elstad*, 470 U.S. 298, 314 (1985). "The relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318. In *Seibert*, a fractured Supreme Court concluded that a law enforcement "strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession," then mirandizing the suspect and obtaining the same confession after waiver, was unlawful because such waivers were clearly involuntary. 542 U.S. at 609. This technique, known as "question-first," was designed "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already

---

applies only if the initial unmirandized interview was custodial and thus unlawful. *See, e.g.*, *United States v. Simmonds*, 641 F. App'x 99, 101 (2d Cir. 2016); *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006); *Sturm v. Superintendent of Indian River Juv. Corr. Facility*, 514 F. App'x 618, 625 n.2 (6th Cir. 2013); *United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007); *Smith v. Clark*, 612 F. App'x 418, 421 (9th Cir. 2015). Yet courts that have circumvented *Seibert* on the basis of an initially lawful interview have done so where there was a factual record and ruling below on the custodial nature of the first interview. *Cf. Courtney*, 463 F.3d at 337 ("Because the record is well developed on this issue, we consider whether Courtney was in custody during the first two interviews."); *Thompson*, 496 F.3d at 811 (same). We have no such record here. Despite our doubts that *Seibert* governs, we assume without deciding that it does. *Accord United States v. Kiam*, 432 F.3d 524, 531–33 (3d Cir. 2006).

confessed." *Id.* at 611. The Court concluded that "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, *close in time and similar in content.*" *Id.* at 613 (emphasis added).

Justice Souter, writing for the four-Justice plurality, set forth "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective," including:

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615. Justice Kennedy, the fifth vote for the majority, concurred separately because he believed the plurality's "multifactor test that applies to every two-stage interrogation may serve to undermine" *Miranda*'s clarity. *Id.* at 622 (Kennedy, J., concurring in the judgment). He instead reasoned that a violation should be found where the question-first method "was used in a calculated way to undermine the *Miranda* warning," that is, deliberately deployed to make the warning ineffective. *Id.*

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). We have "interpreted *Marks*

to mean that the narrowest opinion 'must represent a common denominator of the Court's *reasoning*; it must embody a position implicitly approved by at least five Justices who support the judgment.'" *United States v. Epps*, 707 F.3d 337, 348 (D.C. Cir. 2013) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)) (emphasis in original). Put simply, the concurrence controls when it "posits a narrow test to which the plurality must *necessarily agree as a logical consequence* of its own, broader position." *Id.* (quoting *King*, 950 F.2d at 782) (emphasis in original).

Circuits have split as to whether Justice Kennedy's concurrence controls under *Marks*, *see Straker*, 800 F.3d at 617, with some finding "*Seibert*'s holding in Justice Kennedy's opinion concurring in the judgment," *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006), and others concluding that "the *Marks* rule is not applicable to *Seibert*," because "Justice Kennedy's intent-based test was rejected by both the plurality opinion and the dissent," *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009). The vast majority of Circuits have read *Marks* as requiring the application of Justice Kennedy's test. *See, e.g.*, *United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010); *Kiam*, 432 F.3d at 532; *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005); *Courtney*, 463 F.3d at 338; *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006); *United States v. Guillen*, 995 F.3d 1095, 1120 (10th Cir. 2021); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006). Only the Sixth and Seventh Circuits diverge. *See United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015); *Heron*, 564 F.3d at 884.

This Court has yet not decided which test controls. *Straker*, 800 F.3d at 617. We now join the majority to rule that under *Marks* and *Epps*, the test articulated by Justice

Kennedy's concurrence controls. The plurality's test in *Seibert* analyzes the two-step interrogation through an objective lens: Based on the consideration of a series of factors, were the *Miranda* warnings rendered ineffective to accomplish their object? *Seibert*, 542 U.S. at 615. This test would find both intentionally and unintentionally illegal two-step interrogations to be violative of the defendant's constitutional rights. *See Guillen*, 995 F.3d at 1115–16.

Justice Kennedy's subjective test defines a constitutional violation under a narrower set of circumstances, that is, when the interrogation was deliberately used to circumvent the protections of *Miranda*. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Under this framework, only intentionally unlawful two-step interrogations give rise to a constitutional claim. Thus, "the analysis of the *Seibert* plurality opinion and Justice Kennedy's concurrence merge when a two-step interrogation was deliberately used to evade the requirements of *Miranda*, and the tests diverge when the interrogating officer(s) unintentionally performed a two-step interrogation." *Guillen*, 995 F.3d at 1115. While Justice Kennedy would not agree with every outcome resulting from the plurality's broader test, the plurality would "necessarily agree" that intentional *Miranda* violations that made the warnings ineffective stated a constitutional claim, "as a logical consequence of its own, broader position" that both unintentional and intentional violations are unconstitutional. *Epps*, 707 F.3d at 348 (internal quotation marks and citations omitted) (emphasis omitted). We thus inquire whether the FBI utilized a two-step interrogation strategy "in a calculated way to undermine the *Miranda* warning" given to Neely on October

18th. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

**b.**

As described, Justice Kennedy's test inquires whether "police deliberately use[d] a two-step interrogation to thwart *Miranda*." *Straker*, 800 F.3d at 618. "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Here, Neely has proffered no evidence that the FBI deliberately engaged in a two-step interrogation. In *Seibert*, the officer testified at the suppression hearing that his interrogation technique was an official policy designed to secure admissible confessions. *Id.* at 605–06.

The evidence here is very different. At the outset, there is no suggestion that the FBI used the series of interviews with Neely to secure a confession that would be admissible, and Neely was not arrested at the time of the first two interviews. Neely does not allege, for instance, that the FBI referenced any of his prior statements in the October 18th interview. The record does not reflect the nature of the questioning in the January or June interviews, but it does show that the substance of Neely's statements greatly differed between the first two pre-arrest interviews and the post-arrest interview conducted on October 18th. In the January and June statements, Neely focused on the conduct of others, clearly envisioning himself as an informant. Suppl. App. 17–19 [hereinafter S.A.]. During the October 18th interview, he instead discussed his own actions, including charged conduct such as taking police property and his entrance into the Capitol, including particular

rooms visited. S.A. 15–16. The only common information shared was Neely's statement that he broadcast while in the Capitol and that he saw a "male with the horns" there. *Compare* S.A. 15–16, *with* S.A. 18–19. Unlike in *Seibert*, the pre- and post-waiver statements were thus not identical. In fact, the first two interviews contain little incriminating information beyond the fact of Neely's presence at the Capitol.[3]

But even assuming that the FBI deliberately interviewed Neely this way, the "curative measures" inquiry is dispositive.

In *Seibert*, the defendant was arrested prior to her initial unmirandized interview, which occurred in the middle of the night in a police interview room and involved 30–40 minutes of questioning. 542 U.S. at 604–05. Seibert confessed her awareness of the offense. *Id.* After a 20-minute break, officers returned, turned on a tape recorder, obtained a *Miranda* waiver, and confronted her with her prewarning statements. *Id.* at 605–06. By contrast, here, the last pre-arrest interview was in June

---

[3] Neely asserts that because he was charged under 18 U.S.C. § 1752, "any discussion of his activities at the Capitol that day is necessarily a confession." Appellant Br. 25. But this argument misses the mark. In *Seibert*, the Court was concerned with the nearly indistinguishable nature of the incriminating statements before and after the warning since the constitutional problem arises when law enforcement "leads the suspect to cover the same ground a second time," thereby confusing the suspect who already provided the information without a warning. 542 U.S. at 604, 613. Repeating the same questions and eliciting the same statements before and after contributes to an "impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given." *Id.* at 616. Neely's proposed rule— that *any* incriminating utterance in a prior interview renders a subsequent interview that elicits similar, or different, incriminating information involuntary—finds no support in *Seibert*.

2021, and the challenged statements were elicited four months later, in October.

Four months is "a substantial break in time and circumstances" between the latter June 2021 interview and Neely's post-arrest interview in October of that year. *Id.* at 622 (Kennedy, J., concurring in the judgment). Neely points to no case where a court determined that months between interviews was not sufficiently curative. *Cf. United States v. Lewis*, 833 F.2d 1380, 1387 (9th Cir. 1987) (reasoning that "the interview on the second day was [not] a continuation of what had occurred on the previous day" as over 24 hours had elapsed between interviews and "[t]he agents did not refer to the fact that she had made a statement the previous day").

Moreover, the evidence tended to show that "a reasonable person in [Neely's] situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver," *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment), because the circumstances giving rise to the October 18th interrogation were very different than the pre-arrest interviews. While each occurred in the FBI's Washington Field Office, October 18th was the first statement Neely gave after being charged and arrested, and Neely had undergone the booking process prior. He had not even been charged when he gave the preceding two interviews. Finally, the information conveyed in the interviews also reflects his understanding that they differed in kind.

Neely failed to proffer evidence that the October 18th interview was a part of one "extended interview." *Id.* at 621 (Kennedy, J., concurring in the judgment). The District Court thus did not abuse its discretion in denying Neely a hearing on

20

this issue.[4]  "A defendant is entitled to an evidentiary hearing on his motion to suppress only upon factual allegations which, if established, would warrant relief." *United States v. Law*, 528 F.3d 888, 903–04 (D.C. Cir. 2008) (per curiam) (internal quotation marks and citation omitted).  If the defendant's "assertions [a]re insufficient to establish a constitutional violation," *United States v. Dale*, 991 F.2d 819, 848 (D.C. Cir. 1993) (per curiam), or the District Court need not "resolve any disputes of material fact to decide [the] suppression motion," *Law*, 528 F.3d at 904, denial of a hearing is warranted.  For these reasons, we affirm.

**2.**

Neely also appears to suggest that the statements he gave during his January and June 2021 interviews were

---

[4] Neely asserts in passing that he was subjected to a post-arrest, pre-warning interrogation on October 18th that rendered his later confession constitutionally infirm, disputing the District Court's statement that "[f]ollowing Neely's arrest on October 18, 2021, he was processed and signed a *Miranda* form indicating that he understood and waived his rights," and only after was he "then questioned for approximately 35 minutes."  *Neely*, 2023 WL 1778198, at *10.  Even though Neely alleged that, on October 18th, officers engaged him in conversation about January 6th before he was mirandized, the District Court had no reason to resolve this disagreement through further factfinding because Neely did not identify any incriminating statement made, "let alone one that was later repeated in the statements he seeks to have suppressed." *Id.* at *11 (internal quotation marks omitted).  Any pre-waiver questioning on October 18th thus did not pose a constitutional problem under Neely's own version of events.

unconstitutionally elicited. Any such claim was not adequately raised before this Court. We thus decline to consider it.

The motion to suppress below was not a model of clarity. Neely characterized "[t]he crux" of his motion as "whether or not Mr. Neely's waiver of his right to remain silent was voluntary and knowing . . . before his questioning." Jt. App. 19 [hereinafter J.A.]. This shows that Neely sought to suppress the statements provided *after* the allegedly defective *Miranda* waiver on October 18th, as Neely's prior statements were unmirandized. J.A. 22 ("Mr. Neely is asking this court to find that his subsequent waiver during his third interview was [invalid]."). The motion refers to the maxim that "failure to give Miranda warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained," but only applies this principle to argue that a post-*Miranda* confession obtained in violation of *Seibert* would be invalid. J.A. 21–22 (challenging "this confession," singular). Neely did not argue that the FBI's failure to mirandize him prior to his January and June statements violated his constitutional rights. Any challenge to those statements was not preserved below.

This Court has not yet decided whether Federal Rule of Criminal Procedure 12(b)(3)(C), which requires a defendant to file a motion to suppress prior to trial, "permit[s] plain-error review when a defendant did not intentionally relinquish a claim within Rule 12's ambit, even if the defendant has not offered good cause for his or her failure to timely raise it." *United States v. Burroughs*, 810 F.3d 833, 838 (D.C. Cir. 2016). We need not resolve this question, because Neely has

not argued (under any standard) that the unmirandized interviews were unconstitutional.

On appeal, Neely merely states that "[t]he Motion to Suppress clearly stated that in those earlier interrogations, Appellant 'discussed his broadcasting live from the Capitol with the officers,' which, again was necessarily a confession. The District Court erred in failing to hold a hearing to determine precisely what occurred in any of the interrogations[.]" Appellant Br. 26 (quoting J.A. 19). But "[s]imply listing the issues on review without briefing them does not preserve them." *Terry v. Reno*, 101 F.3d 1412, 1415 (D.C. Cir. 1996). When a defendant "assert[s] error . . . but then offer[s] no argument in support," he "abandon[s] his argument[.]" *United States v. Wilson*, 605 F.3d 985, 1025 (D.C. Cir. 2010); *United States v. Wade*, 255 F.3d 833, 839 (D.C. Cir. 2001) (citing *Unites States v. Feuver*, 236 F.3d 725, 727 n.3 (D.C. Cir. 2001), for the proposition that "issues not briefed are abandoned"). Neely offers no response to the Government's argument that the pre-arrest interviews were noncustodial, such that no *Miranda* warning was required. His failure to argue that the January and June 2021 interviews violated his Fifth Amendment rights precludes our review of any such claim.

## C.

Lastly, the District Court was correct to deny Neely's motion to transfer venue. Because Neely has failed to establish a presumption of prejudice in this jurisdiction, we affirm the denial of his motion to transfer venue.

Criminal defendants have a Sixth Amendment right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. CONST. amend. VI. "The Constitution's place-of-trial prescriptions, however, do

not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Neely moved to transfer venue based on a presumption of jury impartiality. We review the denial of such a motion for an abuse of discretion. *Jones v. Gasch*, 404 F.2d 1231, 1242 (D.C. Cir. 1967).

In this Court, Neely abandoned his contention that the District of Columbia's size and characteristics gave rise to a presumption of jury prejudice, agreeing that such a claim was foreclosed by our intervening decision in *United States v. Webster*, 102 F.4th 471 (D.C. Cir 2024). Neely clarified that he now relies exclusively on pretrial publicity regarding his particular conduct on January 6th, as well as the timing of his trial shortly after congressional hearings investigating those events. Neither argument is persuasive after *Webster*.

*First*, Neely has not shown that press coverage tainted his ability to receive a fair jury trial. "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977). It is not enough to establish "that the community was made well aware of the charges against him." *Id.* Neely must demonstrate "a trial atmosphere . . . utterly corrupted by press coverage." *Id.* (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975)). He has not done so here.

Neely points to a handful of articles that directly refer to him and his January 6th-related conduct. First, a Rolling Stone piece describes his presence at the Capitol as well as a post from his then-Twitter account publicizing the sale of a Capitol Police cap. *See* Charisma Madarang, *Jan. 6 Rioter Stole a*

*Police Officer's Hat, Then Tried to Sell It for $16*, ROLLING STONE (Nov. 30, 2022), https://perma.cc/ED8T-9BWU. The most inflammatory statement in that piece is that Neely "appeared to taunt the FBI—Neely was aware that it had launched an investigation into his actions at the Capitol, including the alleged theft for the rogue hat." *Id.* But even some press statements that "are hostile in tone and accusatory in content" are insufficient where "[t]he overwhelming bulk of the material submitted . . . consists of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) (en banc) (per curiam) (footnote omitted).

The same is true as to the Washington Post article, *see* Jaclyn Peiser, *A Man Stole a Capitol Police Officer's Baseball Cap on Jan. 6, Feds Say. He Wore It on His YouTube Channel.*, WASH. POST (Oct. 19, 2021), https://perma.cc/D9LK-2VN6. Every statement in the latter article is a quotation or paraphrase from another source, "simply recit[ing] the facts of the allegations confronting" Neely. *Webster*, 102 F.4th at 480. Finally, an article from a local news outlet discusses a bench warrant issued for Neely's arrest for failure to appear at a probation violation hearing. *See* Jordan Fischer, *Capitol Riot Defendant 'Absconded' With $200k from Property Sale, DOJ Says*, WUSA9, https://perma.cc/GA53-JS4B (Sept. 2, 2022, 4:58 PM EDT). That article also avoids editorializing, merely describing the allegations against Neely and the contents of court filings. None of the articles to which Neely points contain language as inflammatory as "eye gouger" or "junkyard dog," terms used in articles that the *Webster* court found insufficient to impede upon the defendant's right to a fair trial. 102 F.4th at 480. And even assuming this coverage could create prejudice in the minds of particular jurors, Neely

conceded at argument that jurors could be screened for such bias through *voir dire* questioning, curing any prejudice.

*Second*, the timing of Neely's trial did not prejudice him. The Government contends that the long time period—more than two years—between January 6th and Neely's trial mitigated the prejudice. Neely concedes that the period between January 6, 2021, and his trial is more attenuated than in *Webster*—there, about a year. Instead, he argues that the voluminous news coverage in the months leading up to the House Select Committee hearings regarding January 6th intensified the prejudice, because his trial was less than a year later.

But this Court previously concluded that highly publicized Senate Select Committee hearings regarding the Watergate scandal were not sufficient to presume prejudice, even though it determined that coverage of those hearings was likely higher in this jurisdiction than elsewhere. *Haldeman*, 559 F.2d at 61–62. At argument, Neely contended that the volume of media has exploded since the Watergate era, amplifying the prejudice here, although he agreed that the proffered polling data did not support a conclusion that District of Columbia jurors would be more influenced than elsewhere by the hearings, because those polls were taken before the congressional hearings. But in *Haldeman*, the Court so ruled despite the fact that several jurors had actually watched the congressional hearings. *Id.* The key is not the jury's likely *exposure* to media coverage, but rather

the possibility of *prejudice* against the defendant as a result. Neely has not shown the latter here.

We therefore affirm the District Court's denial of Neely's motion to transfer venue.

**III.**

For these reasons, the District Court appropriately denied each of the pretrial motions. We thus affirm Neely's convictions and sentence.

*So ordered.*