*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

SCOTT JEFFRAY DEMING,

       Defendant-Appellant.

FOR PUBLICATION
April 08, 2026
10:13 AM

No. 368056
Jackson Circuit Court
LC No. 2021-001544-FH

Before: SWARTZLE, P.J., and ACKERMAN and TREBILCOCK, JJ.

SWARTZLE, P.J.

While in custody, defendant confessed to home invasion after he received *Miranda*[1] warnings. He did so, however, only after being questioned first, before he received the warnings. This situation is called a "two-stage interrogation," and statements made by a defendant post-*Miranda* warnings will sometimes need to be suppressed as a violation of the constitutional right against self-incrimination. Today, we clarify that, in Michigan courts, the general voluntariness standard of *Elstad*[2] controls on whether a statement made post-*Miranda* warnings must be suppressed, unless police deliberately used the two-stage interrogation technique to undermine the *Miranda* warnings, in which case the effectiveness of the warnings must first be evaluated under the totality of the circumstances. Finding no errors warranting reversal, we affirm defendant's conviction and sentence.

## I. BACKGROUND

In November 2020, Harold and Barbara Sanger returned to their home, and Harold saw a black "BMX" bicycle in their backyard. Barbara opened the door to the home from the attached garage and discovered an unknown man just inside the doorway. The man told Barbara that there

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] *Oregon v Elstad*, 470 US 298; 105 S Ct 1285; 84 L Ed 2d 222 (1985).

were other people inside the home, struggled briefly with Harold to open the garage door, and then fled on the bicycle. The Sangers called the police and officers arrived at the home.

One of the basement windows to the Sangers' home had been forced open and a canvas duffle bag containing the Sangers' valuables was found in the master bedroom. No other person was found inside the home. Harold described the home invader as having a graying beard and wearing dark clothing, including black gloves; a black, cloth mask; and a dark-colored coat. Barbara described the man as a white man, approximately 5 foot 7 inches tall, with a short beard wearing a black mask; black jeans; and a black, zip-up jacket.

Sergeant Rick Gillespie of the Blackman/Leoni Department of Public Safety had a hunch that the home invader likely fled to the south because that direction led to a less busy area. Using Google Maps with the travel-by-bicycle feature, the sergeant estimated how far a person on a bicycle could travel in 15 minutes and set out in that direction. Eventually, Sergeant Gillespie saw a person wearing black clothing and a mask on a black BMX bicycle traveling southward. The person saw Sergeant Gillespie, turned around quickly in a driveway, and rode away northward. Sergeant Gillespie lost the person and, within a few minutes, heard on the radio that an individual was seen "hopping" backyard fences a few blocks to the north.

At approximately that same time, Sergeant Robert Shrock and another detective saw a white man in a black coat and a mask cross the street on foot, limping. They stopped the man, defendant, on the sidewalk in a residential neighborhood. Sergeant Gillespie arrived and identified defendant as the person whom he saw on the black bicycle.

Sergeant Gillespie had a body-cam on his uniform, and the officer's interactions with defendant and other officers on the scene were recorded. Defendant can be seen sitting on the lawn and sidewalk at various times, and at other times, he is seen standing with an officer near him. The scene was generally relaxed, and defendant was not handcuffed or otherwise physically restrained, but it is clear that he was not free to leave. Sergeant Gillespie was the officer in charge at the scene, and he questioned defendant, talked with dispatch, and spoke with the other officers throughout the approximately 45-minute period at the scene.

When asked by Sergeant Gillespie why he fled from the officer, defendant told him that he had been smoking marijuana. (Given that he was on parole, a fact that eventually came out during the conversation, it is likely that defendant could not consume marijuana, even though by this time the drug was legal under Michigan law.) He told the officers that he had been smoking the drug with a woman a few blocks away, and this would have placed him far away from the Sangers' home. He asserted that he had not entered any house earlier that day.

It is clear that Sergeant Gillespie suspected that defendant might have been the person who broke into the Sangers' home, but the Sangers appeared to be giving officers conflicting accounts of what clothes the suspect had been wearing and whether he had eyeglasses (defendant did). For example, the suspect purportedly wore black pants, but defendant was wearing blue jeans. And there was no mention of the prominent "Michigan" sweatshirt that defendant wore under his coat. The sergeant can be heard telling dispatch that he was getting various reasons for why defendant ran from the officer, "so we're not sure if it's the same one [the suspect] or not." The sergeant

suggested that another officer bring the Sangers over in a squad car to see if they could identify defendant as the suspect.

Sergeant Gillespie asked defendant for his name and identification; defendant replied that he had no identification, but that his name was "Jonathon Jeffrey Single." The sergeant could not find any information about a "Jonathon Jeffrey Single," so he asked defendant for his fingerprint (taken on some kind of electronic device). Defendant eventually told officers that he thought his foot was broken. Information gleaned with the fingerprint revealed defendant's real name, and the sergeant discovered that defendant had a warrant outstanding for violating parole.

Defendant then claimed that he had not been in the house, but that he had seen a "light skinned" man who cut grass just outside the house. Defendant subsequently said he was by the door, and one of the officers asked if defendant was "the lookout" for the light-skinned man, and defendant responded, "Pretty much." At that moment (about the 30-minute mark on the body-cam video), Sergeant Gillespie stopped questioning defendant and told dispatch to cancel the drive-by identification. The sergeant talked with dispatch and other officers on the scene for several minutes and then put the BMX bicycle in his vehicle.

Sergeant Gillespie decided to arrest defendant on the parole violation. He spoke with another officer about whether to give defendant *Miranda* warnings, and the officer replied, "Oh yeah, because he has now admitted to it." At about the 38-minute mark, the sergeant gave defendant *Miranda* warnings and asked, "Do you understand all that?" Defendant is not in view of the body-cam at this time, and the audio is not clear, but the parties appear to agree that defendant responded with "hmm" or "mm-hmm."

The sergeant then asked defendant several questions about the home invasion that defendant did not answer. When Sergeant Gillespie asked defendant if he remembered certain details from the home invasion, defendant replied that he remembered "bits and pieces." Sergeant Gillespie responded, "How about I just tell you what I know and then you just confirm that. Okay?" Defendant continued to insist that there was another person involved, referring to the nephew of someone named "John." After some more back and forth, defendant claimed, "Was there somebody with me? Yeah, he was left in the house."

Sergeant Gillespie explained that no one else was seen at the house and suggested that defendant may have been recorded by a neighbor's security camera. Defendant then asked, "I'm under arrest, right?" and Sergeant Gillespie confirmed that he was. Defendant confessed that he was alone in the house and that he was unable to take anything before he heard the Sangers come home. Defendant was taken to the hospital and treated for a broken ankle.

Before trial, defense counsel moved to suppress defendant's statements to the police. In support of the motion, the only evidence provided to the trial court was the footage from Sergeant Gillespie's body-cam. The trial court granted the motion to suppress as to defendant's statements made pre-*Miranda* warning, but the trial court denied the motion as to defendant's statements made post-*Miranda* warning.

The trial court found that defendant was in custody for the duration of the interrogation because defendant was sitting on the ground with officers standing on each side of him. The trial

court found that defendant's post-*Miranda* statements were made without duress or coercion. Although defendant had a broken foot during the questioning, the trial court noted that defendant still had the wherewithal to give the police a false name and try to avoid being identified. The trial court also found that the police did not "purposefully engag[e] in a two-step interview type of situation to circumvent *Miranda*." The trial court determined that defendant's post-*Miranda* warnings were admissible.

During trial, the Sangers testified, but neither of them identified defendant. Sergeant Gillespie testified that defendant was the person he saw on the bicycle. The portion of Sergeant Gillespie's body-camera footage that recorded defendant's post-*Miranda* confession was played for the jury. The jury found defendant guilty of first-degree home invasion.

At sentencing, the trial court assessed 10 points for Offense Variable (OV) 19 because defendant falsely identified himself, thereby interfering with the administration of justice. Defendant moved for an evidentiary hearing, claiming that he received ineffective assistance of counsel, and he moved for a new trial on the basis that the trial court erred by failing to suppress his statements. The trial court denied defendant's motions and sentenced defendant to serve 10 to 25 years in prison.

Defendant now appeals.

## II. ANALYSIS

### A. DEFENDANT'S STATEMENTS MADE POST-*MIRANDA* WARNINGS

#### 1. *MIRANDA* IN GENERAL

On appeal, defendant first claims that the police violated his federal and state constitutional rights against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. Specifically, defendant argues that the police "brow beat" him into making incriminating statements before giving him the warnings required under *Miranda*. Then, after the warnings, the police asked him to repeat and confirm his statements. He also asserts that he did not actually waive his right to remain silent, and, even if he had, any waiver would have been involuntary under the totality of the circumstances. Defendant maintains that all his statements to the police should have been suppressed.

As noted earlier, the trial court granted in part and denied in part defendant's pretrial motion to suppress. The trial court concluded that defendant was in custody when the police officers detained him in the lawn near the sidewalk and, as a result, any statements he made prior to receiving *Miranda* warnings had to be suppressed. On appeal, the prosecutor does not challenge this; instead, the prosecutor argues that the trial court did not err when it declined to suppress defendant's statements made after the *Miranda* warnings.

We review for clear error the trial court's factual findings in a suppression hearing, and we review de novo the constitutional matter of the trial court's application of the law to those facts. *People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020). A trial court clearly erred if this Court, after reviewing the entire record, is "definitely and firmly convinced that the trial court made a mistake." *People v Swenor*, 336 Mich App 550, 563-564; 971 NW2d 33 (2021).

-4-

The Fifth Amendment to the United States Constitution provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." US Const, Am V. The protections of the Fifth Amendment have been incorporated and applied to the states through the Fourteenth Amendment, US Const, Am XIV. *People v Tanner*, 496 Mich 199, 207; 853 NW2d 653 (2014). The Michigan Constitution also contains a protection against self-incrimination, and this state protection is coextensive with its federal counterpart. Const 1963, art 1, § 17; *Tanner*, 496 Mich at 244-249.

A defendant taken into custody and questioned must be given certain warnings. *Miranda*, 384 US at 478-479. A defendant must be warned that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479.

## 2. TWO-STEP INTERROGATION

It is undisputed that defendant did, in fact, receive *Miranda* warnings. It is also undisputed, however, that he received such warnings only *after* he had been put in custody and questioned intermittently over a period of about 38 minutes. This was, in other words, what is called a "two-step" (or "two-stage") interrogation circumstance, when police question a suspect in custody and obtain certain information (the first step), and then give defendant his *Miranda* warnings and elicit the same or other related, similar information (the second step). The pre-*Miranda* warning information (possibly including a confession) will almost certainly be deemed inadmissible at trial; the more difficult question is whether the post-*Miranda* warning information must also be suppressed.

The U.S. Supreme Court has directly confronted the two-step interrogation technique in two cases. In the first one, *Oregon v Elstad*, the Court was faced with a relatively benign situation, where a police officer spoke briefly with a young suspect in the living room of his mother's home. *Elstad*, 470 US at 301. The record was clear that the suspect was not free to leave, and thus he was deemed to be in custody. *Id.* at 302, 315. The suspect admitted that he had been involved in the burglary that the police were investigating. *Id.* at 301. It was only later at the police station that police gave *Miranda* warnings to the suspect, where he again admitted his involvement in the burglary. *Id.* at 301-302. The earlier statement was suppressed, but the Court permitted use of the second one made at the police station. *Id.* at 318.

As subsequently observed, "In holding the second statement admissible and voluntary, *Elstad* rejected the 'cat out of the bag' theory that any short, earlier admission, obtained in arguably innocent neglect of *Miranda*, determined the character of the later, warned confession." *Missouri v Seibert*, 542 US 600, 614-615; 124 S Ct 2601; 159 L Ed 2d 643 (2004) (plurality). The first statement was the result merely of "a good-faith *Miranda* mistake," and the second statement was voluntarily made by the defendant. *Id.* at 615.

Almost twenty years later, the U.S. Supreme Court considered another two-stage interrogation in *Seibert*, although this one was not the product of a mistake, but deliberate strategy by the police. In *Seibert*, the police took a murder suspect into custody at the police station but did not give her any *Miranda* warnings at the outset. *Id.* at 604-605. Instead, police questioned

her for approximately forty minutes, "squeezing her arm" and repeatedly asking her pointed questions about the murder. *Id.* Only when she confessed did the police then take a twenty-minute break, after which they gave her *Miranda* warnings and obtained another confession. *Id.* at 605.

Like in *Elstad*, there was no question that the pre-*Miranda* warning confession had to be suppressed. Unlike in *Elstad*, the Court concluded that the second, post-*Miranda* warning confession also had to be suppressed. And yet, the reason for that conclusion was not clear from the opinions. No single opinion commanded a majority; rather, the Court splintered into four opinions: (1) a four-justice plurality opinion authored by Justice Souter (joined by Justices Stevens, Breyer, and Ginsburg) that affirmed the Missouri Supreme Court's decision to suppress the second confession, *id.* at 604-617 (plurality); (2) a separate opinion by Justice Kennedy that concurred in the judgment to affirm the state court, *id.* at 618-622 (KENNEDY, J, concurring); (3) a separate opinion by Justice Breyer who, while concurring in full with the plurality, also expressly agreed with Justice Kennedy's concurring opinion, to the extent the two concurring opinions were consistent with each other, *id.* at 617-618 (BREYER, J, concurring); and (4) a dissenting opinion by Justice O'Connor (joined by Chief Justice Rehnquist and Justices Scalia and Thomas), *id.* at 622-629 (O'CONNOR, J, dissenting). The plurality and Justice Kennedy did not disagree so much on the factors to consider when determining whether to suppress a post-*Miranda* confession—i.e., whether the *Miranda* warning was, in fact, effective—but they parted ways with respect to the situations in which those factors were to be applied in the first instance.

Justice Souter, writing for the plurality, contrasted the arguably good-faith mistake in the earlier *Elstad* case with the circumstance in *Seibert*. In the subsequent case, the police were trained and instructed to use the two-stage interrogation as a practical end-run around *Miranda*. This was "candidly admitted" by the police in *Seibert*, and "[b]ecause the intent of the officer will rarely be" as clear as it was in that case, Justice Souter concluded that "the focus [should be] on the facts apart from intent that show the question-first tactic at work." *Id.* at 616 n 6 (plurality).

For the plurality, whenever there is a two-stage interrogation, the reviewing court should begin by focusing on what "a reasonable person in the suspect's shoes" would have understood with respect to the *Miranda* warnings. *Id.* at 615 (plurality). More specifically, "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires," according to the plurality. *Id.* at 611-612 (plurality). "Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?" *Id.* at 612 (plurality).

The plurality went on to identify several factors that could be relevant to this inquiry, including "the timing and setting of the first and second" interrogations, and "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615 (plurality). If the warnings were effective from the perspective of a reasonable person in the defendant's shoes, then "a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *Id.* at 612 n 4 (plurality). Finding that a reasonable person in the defendant's shoes would not have understood her *Miranda* rights, the plurality concluded that her

second confession must be suppressed and affirmed the judgment of the Missouri Supreme Court. *Id.* at 617 (plurality).

Writing for himself, Justice Kennedy likewise concluded that the defendant's confession must be suppressed and affirmed the judgment of the state court. *Id.* at 618, 622 (KENNEDY, J, concurring). According to the Justice, the two-stage interrogation technique used by the police in *Seibert* was "designed to circumvent" *Miranda* by "undermin[ing]" the warning and "obscur[ing] its meaning." *Id.* at 618 (KENNEDY, J, concurring). But Justice Kennedy was not willing to call into question confessions from all two-stage interrogations. He pointed to the situation where a police officer "may not realize that a suspect is in custody and warnings are required." *Id.* at 620 (KENNEDY, J, concurring). Or "[t]he officer may not plan to question the suspect or may be waiting for a more appropriate time." *Id.* In these types of situations, where there is no intent by the officer to do an end-run around *Miranda*, "it would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning." *Id.* In contrast, "[w]hen an interrogator uses [a] deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* at 621 (KENNEDY, J, concurring).

Justice Kennedy's approach, therefore, cut a different swath than that of the plurality. The plurality's "test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations," according to him. *Id.* His approach, in contrast, would be limited only to when police engage in intentional misconduct. But, if a defendant can clear that intentionality hurdle (like in *Seibert*), then Justice Kennedy's approach would dovetail with that of the plurality's, in that he would suppress all statements made post-*Miranda* warnings, except when sufficient "curative measures" were taken by the police "before the postwarning statement is made." *Id.* at 622 (KENNEDY, J, concurring). And in this situation, similar to the plurality's approach, Justice Kennedy would have the focus be an objective one, i.e., whether "a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* He agreed with the plurality that such measures were not taken in that case, and so the defendant's statements made post-*Miranda* warnings had to be suppressed. *Id.*

As for Justice Breyer's separately concurring opinion, a fair reading suggests that he had a foot in both the plurality's camp and Justice Kennedy's camp. Justice Breyer fully signed on to the plurality's opinion, *id.* at 618 (BREYER, J, concurring), though he made clear that a defendant's statements should not be suppressed if "the failure to warn was in good faith," *id.* at 617 (BREYER, J, concurring). To that extent, he noted his agreement "with Justice Kennedy's opinion insofar as it is consistent with this approach and makes clear that a good-faith exception applies." *Id.* at 618 (BREYER, J, concurring).

Justice O'Connor wrote a dissenting opinion, joined by Chief Justice Rehnquist and Justices Scalia and Thomas. She agreed with the plurality's decision not "to focus its analysis on the subjective intent of the interrogating officer." *Id.* at 623 (O'CONNOR, J, dissenting). But she disagreed with the notion that any "lingering compulsion" or "psychological impact" experienced by the defendant, after having already confessed, necessarily created "constitutional implications" with respect to the defendant's post-*Miranda* warnings statements. *Id.* at 627 (O'CONNOR, J,

dissenting). Instead of triggering a special focus on whether the *Miranda* warnings could "effectively advise" the defendant that she "had a real choice about giving an admission at that juncture" and that she "could choose to stop talking even if [she] had talked earlier," *id.* at 611-612 (plurality), Justice O'Connor advocated for a straightforward application of "the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad*," *id.* at 628 (O'CONNOR, J, dissenting). In effect, the mere fact of a two-stage interrogation did not have inherent constitutional implications, according to the dissent; instead, a two-stage interrogation would only implicate the constitutional rights of the defendant to the extent that such interrogation made any of defendant's statements—pre- or post-*Miranda* warnings—actually involuntary.

The U.S. Supreme Court has not clarified *Seibert* in the intervening decades. In *Bobby v Dixon*, 565 US 23; 132 S Ct 26; 181 L Ed 2d 328 (2011), the Court considered *Seibert* in the context of an Ohio case involving capital murder. The Court did not take up, even in dicta, whether the plurality's opinion or Justice Kennedy's opinion was the controlling one in *Seibert*. Instead, the Court determined that there was "no two-step interrogation technique" used in that case, unlike the situation in *Seibert*. *Id.* at 31. Rather, in *Bobby*, the first, pre-*Miranda* warning confession involved forgery, whereas the second, post-*Miranda* warning confession involved murder. *Id.* "Thus, unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, Dixon *contradicted* his prior unwarned statements when he confessed to [the victim's] murder." *Id.* The Court did consider briefly the effectiveness of the *Miranda* warnings, citing both the plurality and Justice Kennedy's respective opinions. *Id.* at 31-32. But at no point did the Court suggest a preference for one opinion over the other, and we are not aware of any lower court that has read *Bobby* as settling the matter. Nor has our own Supreme Court had occasion to settle the matter for Michigan courts.

Likewise, we should also decline to settle the matter in the current case if our decision with respect to the plurality opinion versus Justice Kennedy's concurring opinion would have no practical effect. Specifically, if the technique was used here deliberately by officers to undermine the *Miranda* warning, we would then need to consider the effectiveness of the *Miranda* warning regardless of which opinion we followed. In such a situation, any decision on our part choosing one opinion over the other would merely be dicta, similar to the situation presented to a prior panel of this Court in *People v Delatorre*, unpublished per curiam opinion of the Court of Appeals, issued January 26, 2023 (Docket No. 359394), pp 4-7. Thus, we must consider the question of intentional misconduct before proceeding any further.

### 3. DELIBERATE USE OF TECHNIQUE TO UNDERMINE *MIRANDA*

The trial court concluded that the officers did not deliberately engage in a two-step interrogation technique to circumvent *Miranda*. This is a factual finding by the trial court, *United States v Narvaez-Gomez*, 489 F3d 970, 974 (CA 9, 2007), and ordinarily we would defer to the factual finding of a trial court absent clear error, *Sammons*, 505 Mich at 41; MCR 2.613(C). The trial court did not, however, base its decision on witness testimony or any other evidence uniquely before that court. Rather, the trial court viewed the video from Sergeant Gillespie's body-cam and drew its factual findings solely from that video. "When the record contains a video recording of the events in question, . . . this Court need not rely on the trial court's conclusions as to what the

video contains." *People v Campbell*, 329 Mich App 185, 193; 942 NW2d 51 (2019) (cleaned up); see also *People v Kavanaugh*, 320 Mich App 293, 298; 907 NW2d 845 (2017) (same).

We have reviewed the body-cam video, and although a close call, we agree with the trial court that the prosecutor met its burden of showing by a preponderance of the evidence that the two-stage interrogation was not deliberately used to circumvent *Miranda*. Sergeant Gillespie was the officer in charge, and the time between when he arrived on the scene where defendant had been stopped and when he gave *Miranda* warnings to defendant was approximately 38 minutes. It is clear that Sergeant Gillespie believed that defendant was the person he saw a few minutes before who was riding a bike and then fled after seeing the sergeant, and it is equally clear that the sergeant suspected defendant was involved in the home invasion.

But Sergeant Gillespie was receiving conflicting information from the victims about the suspect's appearance, including clothing and glasses. The officer can be heard telling dispatch, "[W]e're not sure if it's the same one or not." When asked why he fled when he saw the sergeant, defendant claimed it was because he had been smoking marijuana with a woman. Defendant also gave the officers a fake name, and it took much of the time for the officers to figure out defendant's real name, which then led them to learn that defendant had a warrant for a parole violation. While the officers were trying to track down defendant's real name, Sergeant Gillespie arranged to have the victims drive by with another officer to see whether they could identify him as the suspect.

Throughout this time, defendant denied entering the house. At about the 30-minute mark, just after officers learned defendant's real identity and that he was on parole, defendant admitted that he was near the door and "[p]retty much" had acted as a lookout for a "light skinned" man. It was at this point that Sergeant Gillespie canceled the victim identification and shortly thereafter gave defendant his *Miranda* warning. While maintaining for several more minutes that there was another person involved, defendant eventually admitted that he acted alone and that he did, in fact, enter the house. Sergeant Gillespie then put him under arrest and handcuffed him.

The "fog of investigation" was still thick throughout this period. The record shows that Sergeant Gillespie and the others were actively investigating the home invasion that had happened less than an hour or so before. Defendant gave differing accounts of what he had been doing, where he had been located, and even his identification. While defendant was in custody, the custodial setting was an open-air grassy lawn on a sunny day, not a small interrogation room at a police station under fluorescent lights. Much of Sergeant Gillespie's time was spent on the radio or talking with other officers, and even though defendant can be seen talking with other officers, there is significant "down time" during this period. And critically, defendant did not, in fact, give the same story before and after the *Miranda* warnings—before the warnings, he admitted to being by the door and serving as a lookout for a "light skinned" man who entered the home, while after the warnings, he admitted to entering the house and acting alone. Although defendant's differing accounts were not so dissimilar as to take this case completely outside of the *Seibert* context, as was the case in *Bobby*, they do lend support to the conclusion that this is not one of those rare cases when a two-step interrogation was used deliberately to undermine *Miranda*.

Accordingly, we conclude, as did the trial court, that the officers did not "use[] this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview." *Seibert*, 542 US at 621 (KENNEDY, J, concurring). Given this, we must now consider how best to

understand *Seibert* in light of the different approaches set forth by the plurality opinion and Justice Kennedy's concurring opinion with respect to unintentional two-step interrogations.

### 4. *SEIBERT* AND THE "*MARKS* DOCTRINE"

Lower federal and state courts have struggled to determine what, if anything, is the holding of *Seibert* with respect to two-stage interrogations. Generally speaking, "[i]n the American system of *stare decisis*, the result and the reasoning each independently have precedential force, and courts are therefore bound to follow both the result and the reasoning of a prior decision." *Ramos v Louisiana*, 590 US 83, 125 n 6; 140 S Ct 1390; 206 L Ed 2d 583 (2020) (KAVANAUGH, J, concurring). When faced with a splintered decision, as in *Seibert*, "courts follow the result, and they also follow the reasoning or standards set forth in the opinion constituting the 'narrowest grounds' of the Justices in the majority." *Id.*

The "narrowest grounds" rule comes from the U.S. Supreme Court's decision in *Marks v United States*, 430 US 188; 97 S Ct 990; 51 L Ed 2d 260 (1977). When faced with a splintered decision of the Court, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* at 193 (internal quotation marks omitted). "And its precedential force is absolute: The binding opinion from a splintered decision is as authoritative for lower courts as a nine-Justice opinion. This is true even if only one Justice issues the binding opinion." *United States v Guillen*, 995 F3d 1095, 1115 (CA 10, 2021) (cleaned up).

While statement of the rule is straightforward, application is not always so. In practice, application of the rule "usually means that courts in essence heed the opinion that occupies the middle-ground position between (i) the broadest opinion among the Justices in the majority and (ii) the dissenting opinion." *Ramos*, 590 US at 125 n 6 (KAVANAUGH, J, concurring). But in some cases, application of the *Marks* rule is not at all straightforward, *id.*, "making *Marks* an exercise in chasing the wind," *United States v Kratt*, 579 F3d 558, 562 (CA 6, 2009).

Courts and commentators have attached various labels to the approaches used to identify the narrowest ground under *Marks*. Some of these labels include "least-impact analysis," "logical-subset analysis," and even "Matryoshka-nested-dolls analysis." See Maxwell Stearns, *Modeling Narrowest Grounds*, 89 Geo Wash L Rev 461, 534 (2021); see also *King v Palmer*, 950 F2d 771, 781 (CA DC, 1991) (en banc). Each of these captures the same basic idea: the narrowest ground, if there is one, will be the reasoning of the opinion that both (a) joined the Court's judgment, and (b) "is a logical subset of the other opinion (or opinions)." *Kratt*, 579 F3d at 562 (cleaned up). Stated another way, if the opinions that joined the Court's judgment can be arrayed along "a single relevant dimension"—i.e., if a single controlling issue can be identified—then the controlling opinion is the one with the narrowest scope or breadth as measured along that dimension. *Modeling Narrowest Grounds*, 89 Geo Wash L Rev at 470. In terms of least-impact analysis, the opinion with the narrowest scope or breadth would have the least impact on future cases. In terms of logical-subset/Matryoshka-nested-dolls analysis, the opinion with the narrowest scope or breadth would be the one that "is a logical subset of [the] other, broader opinion[]." *King*, 950 F2d at 781.

Under any one of these approaches, it is clear that Justice Kennedy's concurring opinion provided the narrowest ground for the suppression of the confession in *Seibert*. The *Seibert* plurality would have courts consider the effectiveness of *Miranda* warnings in every case involving a two-step interrogation technique, whereas Justice Kennedy would have them consider such effectiveness in only the "infrequent" or "rare" case where police deliberately used the technique to undermine *Miranda*. Compare *Seibert*, 542 US at 611-612 (plurality) with *id*. at 620-622 (KENNEDY, J, concurring). Thus, the plurality's approach would sweep more broadly than Justice Kennedy's, in that the plurality would consider all cases where the two-step interrogation technique was used (intentional and unintentional alike). Given this, in terms of least-impact analysis, Justice Kennedy's concurring opinion would impact fewer cases than would the plurality opinion, in terms of the number of cases where a trial court would suppress a confession.

Similarly, considered through the lens of logical subset/Matryoshka-nested-dolls analysis, the plurality's approach logically and completely subsumes that of Justice Kennedy's approach: (a) The plurality would consider the effectiveness of a *Miranda* warning in every circumstance where Justice Kennedy would consider the matter, but (b) Justice Kennedy would not consider the effectiveness of a *Miranda* warning in every circumstance where the plurality would consider the matter. Moreover, this is not a circumstance where each approach would cover certain cases not covered by the other, i.e., where there is some level of mutual exclusivity between the two approaches. Rather, in all cases where Justice Kennedy's approach would require inquiry into the effectiveness of the *Miranda* warnings, the plurality's approach would also require such inquiry; but the reverse cannot be said. In short, Justice Kennedy's concurring opinion is a complete, logical subset of the plurality opinion.

Finally, considered along a single dimensional array of the question, "Does the use of a two-step interrogation technique require an inquiry into the effectiveness of a *Miranda* warning?" the plurality would answer "Always," Justice Kennedy would answer "Rarely," and the dissent would answer "Never." Thus, Justice Kennedy's concurring opinion holds the "middle-ground position" between the broader plurality and the narrower dissenting opinion. *Ramos*, 590 US at 125 n 6 (KAVANAUGH, J, concurring).

Our conclusion is consistent with the position taken by the overwhelming number of federal and state courts that have considered the matter. See, e.g., *Hernandez v McIntosh*, 146 F4th 142, 158-159 (CA 2, 2025); *United States v Neely*, 124 F4th 937, 949 (CA DC, 2024); *Guillen*, 995 F3d at 1120; *United States v Hernandez*, 751 F3d 538, 539-540 (CA 7, 2014); *United States v Street*, 472 F3d 1298, 1313 (CA 11, 2006); *United States v Courtney*, 463 F3d 333, 338 (CA 5, 2006); *United States v Ollie*, 442 F3d 1135, 1142 (CA 8, 2006); *United States v Williams*, 435 F3d 1148, 1157-1158 (CA 9, 2006); *United States v Naranjo*, 426 F3d 221, 231-232 (CA 3, 2005); *United States v Mashburn*, 406 F3d 303, 308-309 (CA 4, 2005); *Secret v Commonwealth*, 296 Va 204, 222-223; 819 SE2d 234 (2018); *Carter v State*, 309 SW3d 31, 38 (Tex Crim App, 2010); *State v Gaw*, 285 SW3d 318, 323-324 (Mo, 2009); *People v Lopez*, 229 Ill2d 322, 360; 892 NE2d 1047 (2008); *State v Fleurie*, 185 Vt 29, 39; 2008 VT 118; 968 A2d 326 (2008); *Ford v United States*, 931 A2d 1045, 1051-1052 (DC, 2007). One federal court of appeals has not decided the matter, *United States v Faust*, 853 F3d 39, 48 n 6 (CA 1, 2017), and one has adopted the plurality opinion as the appropriate one under *Marks*—the U.S. Court of Appeals for the Sixth Circuit in *United States v Ray*, 803 F3d 244, 270-273 (CA 6, 2015).

The Sixth Circuit's decision in *Ray* is clearly the outlier. Being an outlier does not mean, of course, that the decision is wrong. With that said, we decline to follow *Ray* for several reasons.

The *Ray* court concluded that no controlling opinion in *Seibert* could be identified under the *Marks* doctrine. With respect to Justice Kennedy's concurring opinion, the *Ray* court asserted, "Justice Kennedy's opinion is *not* the narrowest opinion embodying a position supported by at least five Justices in the majority. It embodies a position supported by two Justices, at most." *Ray*, 803 F3d at 271 (adopting as its own a portion of the dissenting opinion of Judge Berzon in *United States v Rodriguez-Preciado*, 399 F3d 1118, 1138-1140 (CA 9, 2005) (BERZON, J, dissenting)).

But in arriving at this conclusion, the *Ray* court drifted away from the relevant set of opinions identified in *Marks*—i.e., the opinions of those Justices who *concurred in the judgment*— and focused extensively on the dissenting opinion in *Seibert*. As the *Ray* court itself emphasized, at least three Justices in the *Seibert* plurality "*and* the four dissenters decisively rejected any subjective good faith consideration, based on the deliberateness on the part of the police." *Id.* Flowing from this, the *Ray* court said, Justice Kennedy's approach was rejected by a majority of the Justices.

That a dissent might take issue with *both* the plurality and a concurring opinion should come as no surprise. More importantly, under *Marks*, the views of those Justices who *did not* concur in the judgment are not part of the relevant set from which a narrowest ground might be identified. See *Marks*, 430 US at 193. Thus, the fact that the dissent agreed with the plurality in its criticism of Justice Kennedy's concurring opinion is of no particular moment under *Marks*.

Relatedly, by focusing on the disagreement that the dissent had with Justice Kennedy's approach, the *Ray* court implicitly applied a form of issue voting, where a member of a multi-judge court votes issue-by-issue and then those votes are aggregated to arrive at an outcome. Under this approach, it would have been perfectly appropriate to add up the number of votes for and against the matter of the police's subjective good-faith, conclude that the matter garnered only one vote (two, at best, if Justice Breyer is included), and reject Justice Kennedy's concurring opinion as a result. And this is what the *Ray* court effectively did when it discounted Justice Kennedy's approach precisely because at least seven Justices disagreed with him on this issue.

But this is not how appellate courts resolve appeals; rather, members of an appellate court who hear a case vote on a judgment, and if multiple opinions concurring in the judgment are issued, those opinions are analyzed to determine whether any controlling ground can be identified. See *Modeling Narrowest Grounds*, 89 Geo Wash L Rev at 525-528. As Stearns has observed, there does not appear to be "an appellate court, quite literally anywhere, that employs" issue-by-issue voting to arrive at a decision. *Id.* at 526. And to reiterate a point made just a few lines before, the U.S. Supreme Court expressly limited the *Marks* inquiry to "those Members who *concurred in the judgments* on the narrowest ground," *Marks*, 430 US at 193-194 (emphasis added), which would logically *exclude* the views of those Justices who were in dissent, see, e.g., *United States v Cundiff*, 555 F3d 200, 206 (CA6, 2009) ("Taken literally, *Marks* instructs lower courts to choose the 'narrowest' concurring opinion and to ignore dissents."). Relying on a dissenting opinion to identify the narrowest ground among the majority of Justices who concurred in the judgment is the judicial equivalent of the tail wagging the dog.

The *Ray* court's focus on the seven Justices who disagreed with Justice Kennedy raises a related point—the possibility that an opinion by a single Justice, rejected by all of the other Justices, can be understood as binding precedent for lower courts. Although relatively rare, there is nothing in the *Marks* doctrine that is offended when the narrowest-ground opinion is authored by a single Justice, parts of which are rejected by all other members of the Court. In fact, it has long been recognized that an opinion by a single Justice can be the controlling one in terms of precedent for lower courts to follow. See, e.g., *Ramos*, 590 US at 149 n 14 (ALITO, J, dissenting) (listing single-Justice opinions that have been treated by lower courts as controlling, including *Regents of Univ of Cal v Bakke*, 438 US 265; 98 S Ct 2733; 57 L Ed 2d 750 (1978)); see also *Modeling Narrowest Grounds*, 89 Geo Wash L Rev at 486-488, 504 n 215.

Lastly and more as an aside, we note that a recent panel of the Sixth Circuit has observed that in adopting the plurality opinion, the *Ray* court has put the Sixth Circuit in the position of standing alone among its sister courts of appeal. *United States v Woolridge*, 64 F4th 757, 762 (CA 6, 2023). The *Woolridge* court ended its *Seibert* analysis by suggesting, "On another day, we should ask whether we must keep our side of this circuit split open." *Id.*

For these reasons, we reject the approach taken by the Sixth Circuit in *Ray* and instead join the significant number of other federal and state courts in recognizing Justice Kennedy's concurring opinion in *Seibert* as the controlling one under the *Marks* doctrine. We believe the U.S. Court of Appeals for the Tenth Circuit in *Guillen* accurately summarized the standard for assessing statements given during a two-stage interrogation circumstance and adopt it as our own:

> First, was the initial self-incriminating statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further. If the initial statement was obtained in violation of the defendant's *Miranda* rights, has the government shown by a preponderance of the evidence that the questioning officer(s) did not engage in a deliberate two-step interrogation calculated to undermine *Miranda*? If so, the defendant's postwarning statement is admissible so long as it, too, was voluntary. If not, the postwarning statement is inadmissible unless the objective circumstances show that a reasonable person in the defendant's shoes would understand the import and effect of the midstream *Miranda* warnings. [*Guillen*, 995 F3d at 1121 (internal citation omitted).]

Because the officers did not engage in intentional misconduct to undermine defendant's *Miranda* warnings, we turn next to whether defendant's statements made post-*Miranda* warnings satisfied *Elstad*.

## 5. VOLUNTARY, KNOWING, AND INTELLIGENT

Applying Justice Kennedy's concurring opinion, we focus on whether defendant's post-*Miranda* warning confession was voluntary, knowing, and intelligent under *Elstad*. Related to this inquiry, we also consider defendant's claim that he did not waive his right to remain silent.

Starting with the waiver, the prosecutor bears the burden of establishing by a preponderance of the evidence that a defendant validly waived his *Miranda* rights. *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000). A defendant's waiver of his *Miranda* rights

is voluntary when the waiver is the " 'product of a free and deliberate choice rather than intimidation, coercion or deception.' " *Tanner*, 496 Mich at 209, quoting *Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed2d 410 (1986). A defendant's waiver is "knowing and intelligent" if "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud*, 462 Mich at 633, 643. A defendant need only have a "very basic understanding" of his *Miranda* rights to waive them knowingly and intelligently. *Id*. at 642. When the prosecutor "shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berguis v Thompkins*, 560 US 370, 384; 130 S Ct 2250; 176 L Ed 2d 1098 (2010).

Here, the parties agree that defendant responded with some form of "hmm" when asked by Sergeant Gillespie if he understood the *Miranda* warnings. Defendant then proceeded to answer Sergeant Gillespie's questions. Although the video of the interrogation does not clearly evidence defendant's response to the warnings, defendant's decision to continue to answer Sergeant Gillespie's questions was sufficient for defendant to waive implicitly his right to self-incrimination. See *Berghuis*, 560 US at 383-384. The trial court did not explicitly address at the suppression hearing whether defendant waived his right to remain silent, but the trial court's decision to admit defendant's post-warning statements necessarily means that the court concluded that defendant waived this right. In these circumstances, we conclude that defendant validly waived his right against self-incrimination.

As for defendant's confession, we likewise see no error in the trial court's decision not to suppress it. Whether a confession was voluntary depends on the totality of the circumstances, including:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988) (citations omitted), reh den 431 Mich 1206 (1988).]

The presence or absence of any particular factor is not conclusive; rather, it is the totality of the circumstances that matters. *Id.*

Looking at the totality of circumstances here, including those factors identified in *Cipriano*, the trial court correctly determined that defendant's statements were voluntary and not the product of duress or coercion from the police. Defendant is a middle-aged adult, and there is nothing in the record that suggests that he lacks ordinary education or intelligence. Defendant had previous experience with law enforcement, as shown by the fact that he was on parole when he was arrested in this case. The record does not show that the police engaged in any prolonged or unnecessary delay in arresting defendant. Although the entire encounter lasted approximately 45 minutes,

much of Sergeant Gillespie's time was spent talking with dispatch and the other officers, trying to identify defendant, and waiting for the drive-by identification; thus, it was an active, ongoing investigation. The police did not deprive defendant of food, sleep, or medical attention. Although it was later discovered that defendant was suffering from a broken ankle, he did not mention this injury until almost 30 minutes into the interaction, and the police took him to the hospital immediately after he was arrested.

As the trial court noted, defendant had the wherewithal to give the police a false name to avoid being identified. Defendant also made up a story about a third person involved in the home invasion, and he can be seen in the body-cam footage standing and moving around. There is nothing in the record that suggests that defendant did not have a basic understanding of his rights and the consequences of waiving them.

Having reviewed the body-cam video and considered the totality of the circumstances, we conclude that defendant's post-*Miranda* warning statements were voluntary, knowing, and intelligent in accordance with *Elstad*. These statements were admissible, and the trial court committed no error by allowing them to be used at trial.

B. SUFFICIENCY OF THE EVIDENCE

Next, defendant argues that the evidence was insufficient to convict him of first-degree home invasion. We review de novo claims of insufficient evidence in a criminal case. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). We draw all reasonable inferences and make credibility choices in support of the jury verdict. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018).

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v Patterson*, 428 Mich 502, 525; 410 NW2d 733 (1987) (cleaned up). Circumstantial evidence and reasonable inferences arising from that evidence may be sufficient to prove the elements of a crime. *Oros*, 502 Mich at 239.

Defendant does not contest that someone committed the crime of home invasion, but, rather, he argues that the evidence was insufficient for a jury to find that *defendant* was the person who committed the offense. "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Defendant highlights the following facts on appeal: the Sangers did not specifically identify defendant at trial; the Sangers did not mention that the suspect was bald and wore glasses; the Sangers testified that the suspect's pants were black, while defendant was wearing blue jeans when the police stopped him; and the suspect fled the home on a bicycle, but defendant was not found with a bicycle.

As the prosecutor argues, Sergeant Gillespie saw defendant on a bicycle within a 15-minute bicycle's ride from the Sangers' home, and defendant fled from the sergeant. Further, defendant confessed to committing the crime of home invasion. Although defendant points to several inconsistencies in the circumstantial evidence, when we consider the evidence in the light most favorable to the verdict, see *Oros*, 502 Mich at 239, defendant has not demonstrated that there was

insufficient evidence from which the jury could find beyond a reasonable doubt that he was the perpetrator.

## C.  OV 19

In his Standard 4 brief, defendant argues that the trial court improperly assessed 10 points for OV 19.  We review for clear error a trial court's factual findings at sentencing.  *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  We review de novo the trial court's application of the facts to the statutory sentencing guidelines.  *People v Armstrong*, 305 Mich App 230, 243; 851 NW2d 856 (2014).  A preponderance of the evidence must support the trial court's findings. *Hardy*, 494 Mich at 438.

Although the sentencing guidelines are only advisory, a trial court is required to score and consider the guidelines when imposing a sentence.  *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015).  A defendant is entitled to resentencing when there is an error in the guidelines and the error affected the guidelines range.  See *People v Francisco*, 474 Mich 82, 89, 92; 711 NW2d 44 (2006).  A trial court may only assess points for an OV for actions related to the sentencing offense, unless the OV statute otherwise provides.  *People v McGraw*, 484 Mich 120, 129; 771 NW2d 655 (2009).

MCL 777.49 governs the scoring of OV 19 and provides, in relevant part, that a trial court should assess 10 points when an "offender otherwise interfered with or attempted to interfere with the administration of justice, or directly or indirectly violated a personal protection order."  MCL 777.49(c).  "[T]he plain and ordinary meaning of 'interfere with the administration of justice' for purposes of OV 19 is to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process."  *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013).  "OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense."  *People v Sours*, 315 Mich App 346, 349; 890 NW2d 401 (2016).

Defendant argues that he was arrested because of an outstanding parole warrant and a warrant for felony possession, rather than for the home invasion.  Defendant claims that he gave the police a false name to evade the legal process with respect to those warrants and not to evade justice for the crime of home invasion.  A defendant's conduct before criminal charges are filed, however, may constitute interference with the administration of justice.  "Providing a false name to the police constitutes interference with the administration of justice, and OV 19 may be scored, when applicable, for this conduct."  *People v Barbee*, 470 Mich 283, 288; 681 NW2d 348 (2004).

Law enforcement officers originally detained defendant as part of the investigation into the home invasion.  A preponderance of the evidence supports an inference that defendant, who had just run from Sergeant Gillespie, told the police a false name to avoid any criminal consequences. Accordingly, the trial court did not clearly err by finding that defendant gave the police a false name to avoid justice for home invasion and properly assessed 10 points for OV 19.

## D.  RIGHT TO CONFRONTATION

Next, defendant argues that his constitutional right to confront the witnesses against him was violated because Sergeant Gillespie canceled the victims' drive-by identification.  We review

de novo whether a defendant's right of confrontation has been violated as this presents a question of constitutional law. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

"The Sixth Amendment of the United States Constitution and Article 1, § 20 of Michigan's Constitution provide a defendant with the right to confront the witnesses against him." *People v Washington*, 514 Mich 583, 592; 22 NW3d 507 (2024). Because the right to confrontation applies to "witnesses," the right generally prevents testimonial statements from witnesses not present at trial from being admitted as evidence. See *Bruner*, 501 Mich at 227. A statement is testimonial if an objective witness would reasonably believe that the statement would be available for use at trial. *Washington*, 514 Mich at 592-593. The right of confrontation only applies to testimonial statements used as substantive evidence. *Id*. at 593.

A drive-by identification is not a matter of testimonial evidence and does not, therefore, implicate defendant's right to confrontation. See *Bruner*, 501 Mich at 227. Further, the Sangers each testified under oath and were subject to cross-examination at trial. Defendant's confrontation right was not violated.

E. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant argues that his due-process rights were violated because defense counsel was ineffective. Because claims of ineffective assistance of counsel present mixed questions of fact and law, we review for clear error factual findings and review de novo legal conclusions. *People v Urbanski*, 348 Mich App 90, 97; 17 NW3d 430 (2023) (cleaned up).

First, defendant argues that defense counsel was ineffective for failing to move for a *Walker* hearing to determine the admissibility of defendant's statements to the police. When a defendant challenges whether a statement that the defendant made to police was voluntary and admissible, the trial court must hold a hearing outside the presence of the jury to determine the voluntariness of the challenged statement. *People v Walker*, 374 Mich 331, 337-338; 132 NW2d 87 (1965). See also MRE 104(c).

The trial court decided the motion to suppress outside the presence of the jury at a hearing and concluded that defendant's post-*Miranda* statements to the police were voluntary and admissible. This procedure conformed with the requirements set out in *Walker*, 374 Mich at 337-338. There was, accordingly, no reason for defense counsel to move for another hearing on the voluntariness of defendant's statement to the police. Failing to take meritless or futile action does not constitute ineffective assistance of counsel. See *Ericksen*, 288 Mich App at 201. Defense counsel's performance was not deficient in this regard, and there is no reasonable likelihood that another hearing on this issue would have resulted in the suppression of defendant's post-*Miranda* statements or changed the result of trial. See *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023).

Next, defendant argues that defense counsel was ineffective for failing to inform defendant of a plea agreement offered by the prosecutor whereby defendant would plead guilty to second-degree home invasion in exchange for the prosecutor dismissing the fourth-offense habitual offense status at sentence, including a "cap" of 36 months in prison. Defendant argues that defense counsel only informed him that the plea offer included a sentence "at the lower end of the

guidelines," as stated by defense counsel on the record during a pretrial hearing. Defendant asserts that he would have accepted a plea agreement if he had known that it involved a 36-month maximum sentence. The right to effective assistance of counsel extends to the plea-bargaining process. See *Lafler v Cooper*, 566 US 156, 162-163; 132 S Ct 1376; 182 L Ed 2d 398 (2012).

Second-degree home invasion is a Class C felony, MCL 777.16f, and defendant's prior record variable of 130 points and OV score would have provided for a minimum sentencing guideline range of 36 to 71 years. MCL 777.64. Therefore, a plea offer of a sentence "at the lower range of the guidelines" is the same as an offer of a sentence with a 36-month "cap." It appears from the record that only one plea agreement was offered, and, even if it was described in different ways, defendant was informed of the offer and rejected it. Defendant has not demonstrated that he received ineffective assistance of counsel in this regard.

Lastly, defendant argues that defense counsel was ineffective for failing to challenge Sergeant Gillespie's testimony regarding the sequence of events of defendant's arrest and processing. Although defendant alleges that Sergeant Gillespie committed "perjury," the body-cam footage shows that Sergeant Gillespie took defendant to the hospital immediately after arresting him, as Sergeant Gillespie testified. Regardless, this order of events was not significant to defendant's trial. Therefore, defense counsel was not ineffective.

## III.  CONCLUSION

Officers subjected defendant to a two-step interrogation, but we agree with the trial court that they did not deliberately use that technique to undermine defendant's *Miranda* warnings. Given this, his post-*Miranda* warnings statements need not be suppressed. Finding no errors warranting reversal, we affirm defendant's conviction for home invasion and his resulting sentence.

Affirmed.

/s/ Brock A. Swartzle
/s/ Matthew S. Ackerman
/s/ Christopher M. Trebilcock